Weaver v. Wood.

ELIZABETH A. WEAVER & another[1] *vs.*
HARVEY W. WOOD & others.[2]

Suffolk. January 7, 1997. - June 19, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Practice, Civil,* Standing. *Trust,* Charitable trust, Beneficiary. *Charity. Attorney General.*

Where the Publishing Society of the Christian Science Church was established
  by a deed of charitable trust to promote and extend the religion of Christian
  Science, certain individuals who were members in good standing of the
  church but who were not named beneficiaries of the trust were without
  standing to maintain an action against the directors, trustees or officers of
  the church or society for alleged violation of their fiduciary duties.
  [274-278]

CIVIL ACTION commenced in the Superior Court Department on
December 30, 1993.

The case was heard by *Vieri Volterra,* J., on a motion for
summary judgment.

Leave to prosecute an interlocutory appeal was allowed in
the Appeals Court by *George Jacobs,* J. The Supreme Judicial
Court granted an application for direct review.

*Stephen M. Shapiro,* of Illinois (*Damian R. LaPlaca* with
him) for the defendants.

*Cerise H. Lim-Epstein* (*Mary M. Diggins* with her) for the
plaintiffs.

*Douglas Laycock,* of Texas, *William L. Patton,* & *Laurie R.
Wallach* for Americans United for Separation of Church and
State & others, amici curiae, submitted a brief.

[1]Roy D. Varner.

[2]Virginia S. Harris, John L. Selover, Olga M. Chaffee, Richard C. Bergen-
heim, Al M. Carnesciali, Jill Gooding, John H. Hoagland, Annetta Douglass,
J. Anthony Periton, Hallock Davis, Harry Schiering, and Honor Ramsay Hill.
Each of the defendants is a present or former director, trustee, or officer of
either the First Church of Christ, Scientist, in Boston, or The Christian Sci-
ence Publishing Society, or both.

MARSHALL, J. Two members of the First Church of Christ, Scientist, in Boston (Church)[3] seek to challenge decisions of the directors of the Church and its publishing arm, The Christian Science Publishing Society (Publishing Society), to expand the Publishing Society's activities in the electronic media. The plaintiffs claim that the defendants failed to abide by the Church's relevant governing documents when they authorized major investments in television ventures in the late 1980's and the early 1990's in violation, it is alleged, of the defendants' fiduciary duties. The defendants moved for summary judgment on several grounds, including that these two individuals do not have standing to bring this action. A judge in the Superior Court denied their motion, concluding, as to standing, that the plaintiffs "are members of the Mother Church in a special and unique manner separate and distinct from any member of the public."[4] A single justice of the Appeals Court, acting pursuant to G. L. c. 231, § 118, first par., authorized this interlocutory appeal, and we granted the defendant's application for direct appellate review. We conclude under well-settled principles of law long enforced by this court that the plaintiffs do not have standing to obtain judicial redress in this matter. We vacate the ruling of the judge below, and order that this action be dismissed.

1. Central to the plaintiffs' claim is their allegation that the defendants have failed to abide by two deeds of trust executed by Mary Baker G. Eddy, the founder of Christian Science, and the Church by-laws that are contained in a "Manual of The Mother Church" (Manual), also prepared and executed by Eddy. We summarize the relevant governing documents.

The Church was first organized in 1879 by Eddy and several of her followers under a corporate charter of the Commonwealth, later disbanded. In 1892, Eddy executed a deed of trust (1892 deed) conveying certain land in Boston to four grantees, subject to certain conditions. The deed provided

---

[3]The First Church of Christ, Scientist, in Boston, is sometimes referred to as The Mother Church. See *Chase* v. *Dickey*, 212 Mass. 555, 556 (1912).

[4]Another judge of the Superior Court earlier had denied, in part, the defendants' motion to dismiss and had ruled that the individual plaintiffs could proceed with their action because, he concluded, "the interests of the individual plaintiffs in the enforcement of the by-laws [of the Church] are distinct from the interests of the general public," and "the public interest in the proper adherence to the Mother Church's by-laws is neither directly nor essentially involved."

that the grantees would serve as the "Christian Science Board of Directors" (board), a self-perpetuating body,[5] and further provided that the board would cause a church to be built on the land in which to teach the doctrine and practice of Christian Science. The 1892 deed charged the board with numerous other obligations relating to the fulfilment of Eddy's mission for Christian Science. It specified that the congregation worshiping in the church to be built "shall be styled 'The First Church of Christ, Scientist,' " but makes no reference to individual members of the Church. They are not identified as beneficiaries in any respect.

In 1895, Eddy published the first edition of her Manual, including what Eddy identified as the Church by-laws.[6] The by-laws described the officers of the Church, including a "Christian Science Board of Directors," and granted the power to transact all Church business exclusively to the board.[7] Prior to her death in 1910, Eddy amended the Manual and the by-laws several times. As described by the defendants, after Eddy's death the Manual became the "permanent, unchanged rules of governance" of the Church, with all authority to direct the affairs of the Church resting in the board. See *Eustace* v. *Dickey*, 240 Mass. 55, 71 (1921) ("the entire management . . . passed into the hands of the directors, a self-perpetuating body, all this at the suggestion and with the approval of Mrs. Eddy"). The Manual grants no voting rights to the members of the Church. See *id.* at 70 ("Members of the church had no voting power").

Article XXIV, § 4 of the by-laws provides for a three-

[5]The 1892 deed specified that "[w]henever a vacancy occurs in said Board the remaining members shall within thirty days fill the same by election." The deed also required that board members be "firm and consistent believer[s]" in Christian Science.

[6]As explained by the defendants, in their view the Manual is "divinely inspired" and the administration of the by-laws is a deeply religious matter, the meaning of which is understood and appreciated "through the application of prayer, an understanding of Christian Science, and a comprehension of Mrs. Eddy's spiritual and governmental design for her Church."

[7]Although the record is not clear, it appears that the "Christian Science Board of Directors," as Eddy used that term in the Manual, was the same board referred to in the 1892 deed. According to the defendants, in 1903 Eddy increased the number of board members from four to five by amending art. I, § 5, of the Church by-laws. The plaintiffs and the defendants use the terms "board" and "directors" without distinguishing between the 1892 deed and the Manual. See *Eustace* v. *Dickey*, 240 Mass. 55, 69-71 (1921).

member committee on finance, appointed annually by the board. As described in the Manual, the committee on finance is required to hold quarterly meetings, and its three members are required to "keep themselves thoroughly informed as to the real estate owned by this Church and the amount of funds received by the Treasurer of The Mother Church." The committee on finance is also charged with the responsibility of an annual audit of the Church's finances "by an honest, competent accountant." In the event that the committee on finance determines that there has been any possible "deviation from duty," the Manual charges that it shall "visit the Board of Directors, and, in a Christian spirit and manner, demand that each member thereof comply with the By-laws of the Church." If any director fails to heed this admonition, "he may be dismissed from office and the vacancy supplied by the Board." Thus, the ultimate fiscal responsibility for the Church rests with the board.

In 1898, Eddy executed an additional deed of trust (1898 deed) that established the Publishing Society "for the purpose of more effectually promoting and extending the religion of Christian Science." The 1898 deed directs the trustees of the Publishing Society to "account of all the business done by them" and, every six months, to pay over to the Church treasurer "all surplus funds over and above the sum necessary to defray" the Publishing Society's running business expenses. The Publishing Society trustees are charged with the management of all of its operations, subject to the comprehensive and final authority of the board. The 1898 deed does not grant to any members of the Church any beneficial rights. "It is manifest from the structure of the [1898] trust deed as well as from its express words that the single and only design of the founder was to promote and extend the religion of Christian Science as taught by Mrs. Eddy. Every part of the trust deed reinforces and makes even more plain the avowed purpose of Mrs. Eddy that her sole and completely dominating aim in establishing the trust was to promote and extend the religion of Christian Science as taught by her." *Eustace* v. *Dickey, supra* at 73.

Since its inception the Publishing Society has produced many publications including a daily newspaper, The Christian Science Monitor (since 1908), and various radio programs (since the 1930's). Beginning in the mid-1980's the Publishing

Society began pursuing the medium of television as a means of accomplishing its mission. In its fiscal year 1986, the Publishing Society initiated a monthly television program in conjunction with the Independent News Network, which became a weekly program in July 1986. The Church also purchased a Boston-area television station, ultimately investing more than $60 million in that venture. From September, 1988, through January, 1992, a daily television program produced by the Church entitled "World Monitor" aired on the cable television's Discovery Channel. In 1991 the Church proceeded with a plan to develop a twenty-four hour television network called "The Monitor Channel." It was launched in May, 1991, and soon began incurring significant losses. From May, 1991, through the end of fiscal year 1992, the Monitor Channel had deficits in excess of $30 million. The Monitor Channel ceased broadcast operations in April, 1992.

The defendants claim that these various television ventures were undertaken to "promote" and "extend" Christian Science, to advance the Church's religious interests and to fulfil its mission as described by Eddy in her 1898 deed. The failure of the television ventures and the accumulation of significant debts in connection with those ventures form the crux of the plaintiffs' allegations against the defendants.

2. We turn to consider whether the plaintiffs have standing to maintain this action. The plaintiffs describe themselves as "life-long members in good standing" of the Church; they do not claim to be members of the Publishing Society. They have never held office in the Church, nor are they directors of the Church or trustees of the Publishing Society. Is their status as members sufficient — without more — to confer standing on them?

We begin by stating what may seem entirely obvious: the Church is a public charity, established by Eddy under a series of charitable trusts.[8] The 1892 instrument executed by Eddy conveyed land in trust for the purpose of building a "suitable

---

[8]A charitable trust is "a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." Restatement (Second) of Trusts § 348 (1959). See *Hillman* v. *Roman Catholic Bishop of Fall River*, 24 Mass. App. Ct. 241, 242-243 n.3 (1987) (charitable trust is imposition of trust with a specific charitable purpose, as contrasted to gift with general charitable intent).

and convenient church edifice," in which to "maintain public worship in accordance with the doctrines of Christian Science in said church." Her second deed, executed in 1898, granted property in trust to the Publishing Society for "promoting and extending the religion of Christian Science." In addition to these two trusts, in the residuary clause of her will Eddy made a further gift to the Church in trust for the "purpose of more effectually promoting and extending the religion of Christian Science." In *Chase* v. *Dickey*, 212 Mass. 555, 566 (1912), we concluded that her residuary clause created a charitable trust and that the "[r]elief of spiritual destitution and religious or moral ignorance, intolerance or perversity, is a good public charity." See *Krauthoff* v. *Attorney Gen.*, 240 Mass. 88, 89 (1921).

In the case of a private trust, only a named beneficiary, or one suing on his or her behalf, can maintain an action to enforce a trust. *Collector of Taxes of Lowell* v. *Slafsky*, 332 Mass. 700 (1955); 3 A.W. Scott & W.F. Fratcher, Trusts §§ 200, 209 (4th ed. 1988). When a trust is charitable, and is created not to benefit one or more individuals but is devoted to purposes that are beneficial to a broader community, the Legislature has determined that the Attorney General is responsible for ensuring that its charitable funds are used in accordance with the donor's wishes; "[t]he attorney general shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof." G. L. c. 12, § 8.[9]

We consistently have held that only the Attorney General can bring an action alleging the misuse of charitable assets. A century ago we noted: "The law has provided a suitable officer to represent those entitled to the beneficial interests in a public charity. It has not left it to individuals to assume this duty, or even to the court to select a person for its performance. Nor can it be doubted that such a duty can be more satisfactorily performed by one acting under official responsibility than by individuals, however honorable their character and motives may be." *Burbank* v. *Burbank*, 152 Mass. 254,

[9]According to the defendants, and not challenged by the plaintiffs, the Attorney General has been apprised of these proceedings and has received copies of the relevant pleadings and rulings, but has not sought to intervene in this action.

256 (1890). In *Dillaway* v. *Burton*, 256 Mass. 568, 573 (1926), we held that it is "the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of proper proceedings. It is his duty to see that the public interests are protected and to proceed in the prosecution or to decline so to proceed as those interests may require."

Five years prior to our holding in *Dillaway*, we concluded with respect to the 1892 and the 1898 trusts at issue in this case that three individuals claiming to be members in good standing of the Church who purported to bring suit "on behalf of themselves and of all other members of the Church" in order to "preserve and uphold the Church Manual, the form of government of The Mother Church as established by Mary Baker Eddy," lacked standing to litigate their claims; "the plaintiffs show no private interest, and the interests of the public are represented by the Attorney General." *Krauthoff* v. *Attorney Gen.*, *supra* at 92. More recently, in *Lopez* v. *Medford Community Ctr., Inc.*, 384 Mass. 163, 167 (1981), we held that it is the Attorney General who has an "exclusive and discretionary role as a protector of the public interest in the efficient and lawful operation of charitable corporations." See *Ames* v. *Attorney Gen.*, 332 Mass. 246 (1955); *City Bank Farmers Trust Co.* v. *Carpenter*, 319 Mass. 78, 81 (1946).

We have on occasion recognized a private plaintiff's standing to make claims against a public charity, but only where the plaintiff asserts "interests in such organizations which are distinct from those of the general public." *Lopez* v. *Medford Community Ctr., Inc.*, *supra*. In each such case the claim has arisen from a personal right that directly affects the individual member, such as where the member has a right to exercise a vote in connection with some aspect of the charity's affairs (a right not present here) and is prohibited from doing so. See *Lopez*, *supra*; *Jessie* v. *Boynton*, 372 Mass. 293 (1977); *Mitchell* v. *Albanian Orthodox Diocese in Am., Inc.*, 355 Mass. 278 (1969). In *Lopez*, for example, the plaintiffs sought to exercise their right to vote in the corporation's annual election, as explicitly allowed by the corporation's constitution and by-laws. We held that the plaintiffs had standing *only* to litigate their claim that, because the corporation refused to allow them to vote, they were unlawfully denied membership in the

corporation. *Lopez, supra* at 168. In that case the plaintiffs had also made claims (similar to those made here) that the defendants had "mismanaged and neglected the affairs of the corporation" and had "improperly borrowed money." *Id.* at 165. We said that they "had no standing to prosecute their claims of corporate mismanagement," *id.* at 169, and that it is "the exclusive function of the Attorney General to correct abuses in the administration of a public charity." *Lopez, supra* at 167, quoting *Ames* v. *Attorney Gen., supra* at 250.

The judge below concluded that the plaintiffs had standing because they "are members of the Mother Church in a special and unique manner separate and distinct from any member of the public." While the plaintiffs' relationship with the Mother Church is indeed different from a member of the public who is not a member of the Church, we have never held that membership in a public charity, alone, is sufficient to give standing to pursue claims that a charitable organization has been mismanaged or that its officials have acted ultra vires. The judge also concluded that, as individual members of the Church, the plaintiffs "stand as beneficiaries" of the 1892 and 1898 deeds and the will of Eddy.[10] We have reviewed the various instruments and conclude, as we have in the past, that individual members of the Church are not "beneficiaries" in the sense that they have standing to enforce the provisions of the 1892 or the 1898 deeds of trust, or the terms of Eddy's will. In *Dittemore* v. *Dickey*, 249 Mass. 95, 106 (1924), we ruled that under the 1892 trust the "intent of the grantor in the deed is plain that she desired the grantees whom she named as directors of the Church to hold this property as officers of churches hold property." In *Eustace* v. *Dickey*, 240 Mass. 55, 78 (1921), we held that under the 1898 trust the Church "was the beneficiary of all net profits arising from the management of that trust," and that no member of the Church obtained any personal rights in the Publishing Society or its assets. And Eddy did not designate any individual

---

[10]The plaintiffs alleged in their complaint that each "is a beneficiary of The Mother Church and of the various wills, trusts and bequests established by Mrs. Eddy and others to fund and maintain The Mother Church." As noted earlier, the defendants previously filed a motion to dismiss. The judge who decided that motion correctly observed that in evaluating the sufficiency of the complaint he was required to accept these allegations as true. *Eyal* v. *Helen Broadcasting Corp.*, 411 Mass. 426, 429 (1991), and cases cited.

members as her intended beneficiaries in the residuary clause of her will. See *Chase* v. *Dickey*, 212 Mass. 555, 557 (1912).

The plaintiffs may be of the view that they are "beneficiaries" of Eddy in a religious or theological sense. They have not, however, demonstrated that they are beneficiaries of any of Eddy's trusts in any legal sense. As such, they have no enforceable legal interest in the administration of the charity, and have no standing to pursue such claims. Cf. *Trustees of Dartmouth College* v. *Quincy*, 331 Mass. 219, 225 (1954). 4A A.W. Scott & W.F. Fratcher, Trusts § 391, at 370-373 (4th ed. 1989); Restatement (Second) of Trusts § 391 & comments c and d (1959).

We vacate the ruling of the judge below denying the defendants' motion for summary judgment, and remand this matter to the Superior Court for entry of a judgment dismissing this action.

*So ordered.*