CATHERINE R. MAFFEI, individually & as trustee,[1] & others[2] vs.
ROMAN CATHOLIC ARCHBISHOP OF BOSTON.

Middlesex. February 8, 2007. - May 25, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Religion. Constitutional Law,* Freedom of religion. *Jurisdiction,* Ecclesiastical
controversy. *Practice, Civil,* Standing. *Trust,* Charitable trust, Constructive
trust, Resulting trust. *Charity. Attorney General. Frauds, Statute of.
Negligence,* Misrepresentation.

In an action in Superior Court concerning the transfer of real estate and other
property from the plaintiff parishioners to the defendant diocese, the judge
properly granted summary judgment in favor of the defendant, insofar as
the plaintiffs' claims (which were predicated on the alleged fiduciary or
confidential relationship between a member of the Roman Catholic Church
clergy and his congregants) raised matters of internal church governance,
an issue foreclosed from judicial inquiry by the First Amendment to the
United States Constitution [242-244]; and where, even aside from the
question of the plaintiffs' standing [244-246], to the extent that the
plaintiff's claims pertained to matters legally cognizable in civil court, they
failed in one or more of their essential elements [246-256].

CIVIL ACTION commenced in the Superior Court Department on
June 8, 2005.

The case was heard by *Herman J. Smith, Jr.,* J., on motions
for summary judgment.

The Supreme Judicial Court granted an application for direct
appellate review.

*Paul S. Hughes & Joseph J. Balliro, Jr.,* for the plaintiffs.

*Francis J. O'Connor (Mark C. Rogers & Wilson D. Rogers,
Jr.,* with him) for the defendant.

*Sharon M. Harrington,* for Council of Parishes, amicus curiae,
submitted a brief.

*Mary K. Ames & John M. Galvin,* for Grace Corrigan & oth-
ers, amici curiae, submitted a brief.

---

[1]Of the Waldo M. Maffei Revocable Trust.

[2]Maureen Maffei, as trustee of the Waldo M. Maffei Revocable Trust, and
Eileen Hanafin.

MARSHALL, C.J. In this case concerning the transfer of real estate and other property from parishioners to their diocese, the plaintiff parishioners ask us, among other claims, to rule that the spiritual authority of a clergy member over members of his faith, without more, gives rise to a cognizable fiduciary relationship, or alternatively a legal relationship of "trust and confidence." We decline to do so.

The case arises from the suppression[3] of St. James the Great Parish in Wellesley (St. James) in 2004 by the Roman Catholic Archbishop of Boston (RCAB), a corporation sole. See St. 1897, c. 506. St. James was built in 1958 on an eight-acre parcel of land (property) acquired by the RCAB in 1946 from Waldo M. Maffei (Waldo) and his five siblings. Waldo and his sister voluntarily transferred their respective interests in the property to the RCAB for no monetary payment, and Waldo's four brothers each received $3,000 for their respective shares. In connection with the property transaction, Waldo's wife, Catherine Maffei (Catherine), released her rights of "dower and homestead." The church was named in honor of Waldo's father, James Maffei (James), allegedly in fulfilment of an oral agreement between the RCAB and the Maffei family that the property would "forever" be used as the site of a church so named, although the plaintiffs' verified complaint alleges, and the judge found, that Waldo had been prepared to donate his interest in the property to the RCAB before any alleged oral agreement about the future use of the property was made.

After St. James closed, Catherine, individually, and with her daughter, Maureen Maffei, as trustee of the Waldo M. Maffei Revocable Trust[4] (collectively, Maffeis), filed a verified complaint in the Superior Court seeking declaratory and injunctive relief in the form of a resulting or constructive trust on the property in their favor, and for breach of contract and negligent mis-representation. Their claims center on the alleged oral agreement between the Maffei siblings and the RCAB that the property

---

[3]"Suppression" is a term of the Roman Catholic Code of Canon Law, which means to end the existence of a parish.

[4]The record does not disclose when the trust was created, although, as we discuss *infra*, it is undisputed that the trust is not a party to the property dispute at issue.

would be maintained in perpetuity as a church in honor of Waldo's father, as well as on the RCAB's failure to draft a deed reflecting that, if the property were not so used, ownership would revert to the Maffeis. The Maffeis were joined by plaintiff Eileen Hanafin, who sought recovery from the RCAB for alleged negligent misrepresentation in connection with a donation of $35,000 she made to St. James more than two years before its closure.

The claims of all three plaintiffs rest, in whole or in part, on the presumption that the RCAB owed them a legal duty, grounded in the "trust and confidence" inherent (they allege) in the priest-parishioner relationship, to inform them that, under canon law, St. James could be suppressed at a future time. A judge in the Superior Court allowed the RCAB's motion for summary judgment on all counts and dismissed the case. We granted the plaintiffs' application for direct appellate review.

We conclude that summary judgment in the RCAB's favor was proper. First, as we explain below, insofar as the plaintiffs' causes of action are predicated on the alleged fiduciary or confidential relationship between a member of the Roman Catholic Church clergy and his congregants, the claims in this case raise matters of internal church governance that the First Amendment to the United States Constitution forbids us to consider.[5] We may not, consistent with the First Amendment, inquire into any alleged pastoral duties owed by the Roman Catholic priesthood to its laity concerning matters of canon law. See, e.g., *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich*, 426 U.S. 696, 710 (1976); *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 785, cert. denied, 511 U.S. 1142 (1994). Second, to the extent that the plaintiffs' claims pertain to matters legally cognizable in our civil courts, they fail in one or more of their essential elements. See Mass. R. Civ. P. 56, 365 Mass. 824 (1974). We may not address grievances that are insufficiently supported by cognizable evidence.[6]

1. *Facts.* We summarize the judge's findings and other un-

---

[5]The First Amendment to the United States Constitution states, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[6]We acknowledge the amicus briefs of the members of St. Jeremiah Parish

contested material of record, as viewed in the plaintiffs' favor. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). The RCAB was incorporated by the Legislature in 1897, and empowered, among other things, to "receive, take and hold, by sale, gift, lease, devise or otherwise, real and personal estate of every description, for religious, charitable and burial purposes, and to manage and dispose of the same for the religious and charitable purposes of the Roman Catholic church." St. 1897, c. 506, § 2. In the 1940's, Reverend Robert H. Lord of St. Paul's Parish in Wellesley sought permission from the RCAB to purchase land to establish a church to serve the needs of the growing Roman Catholic population of East Natick and the adjacent "Fells section" of Wellesley, who were geographically isolated from existing parishes in those towns. The RCAB approved the request, and Reverend Lord began searching for a suitable location for the new church. He soon identified a tract of approximately eight acres of land on the Worcester Turnpike in Wellesley as "the best site — and, indeed, the only good site — for such a church." The land was held in equal shares as tenants in common by James's six children.[7]

Some time in 1946, Reverend Lord had several conversations with Waldo in Waldo's home during which he inquired about the Maffei family's donating the property to the RCAB for use as the site of a church. The conversations apparently occurred in the presence or within the hearing of Catherine. According to a "statement under oath" that Catherine gave to her attorneys in May, 2005, Reverend Lord came to the Maffei house several times to explore obtaining the property for use as a church.[8] Waldo thereafter contacted his sister and four brothers about the RCAB's request, but they rejected it. On the third visit to Wal-

and others, and the Council of Parishes.

[7] James Maffei, an Italian immigrant, established a successful sand and gravel business and owned several tracts of land in Wellesley and the surrounding area. He purchased the property in 1925. James Maffei died in 1937, and his wife, Angela, died in 1943.

[8] The verified complaint avers that, prior to any subsequent conversation between Waldo and Reverend Lord about naming the church for James, "[t]he Maffei brothers, other than Waldo, desired to receive money for the transfer of their interests."

do's home,[9] in the presence of Catherine, Reverend Lord told Waldo that the church would be named "St. James" in honor of Waldo's father, and that the church would remain a tribute to James "forever." He also told Waldo that the RCAB would pay each of the other four Maffei brothers $3,000 to transfer their respective interests in the property.[10] According to Catherine, who is the sole surviving participant of these events,[11] during negotiations for the property Reverend Lord did not inform any members of the Maffei family that canon law permitted the closure of the church in the future.[12]

The Maffei family agreed to transfer the property to the RCAB

---

[9]The judge's statement that Reverend Lord visited Waldo's home three times to ask about the property is consistent with the number of visits alleged in the verified complaint. A letter from Reverend Lord to his superiors introduced in evidence by the Maffeis referred to "protracted negotiations" with the Maffei family. Catherine, in her sworn statement, testified that Reverend Lord "came back [to her home] several times" to talk about the property.

[10]The verified complaint and Catherine's sworn statement are often at odds on key factual representations. According to Catherine's sworn statement, it was Waldo who first raised the issue of naming the church after his father; after Reverend Lord told Waldo that he had made inquiries of his superiors and determined that this was possible, Waldo said that the deal could be finalized if the RCAB were willing to give his brothers "some little thing," such as "$3,000 apiece" to transfer their respective interests. The verified complaint alleges that Reverend Lord is the person who broached the idea of naming the church for James Maffei (James), and that Waldo's brothers asked to be paid $3,000 each for their interests in the property. The judge's findings follow the version of events set out in the verified complaint rather than Catherine's relatively more spontaneous sworn statement, and we discern no abuse of discretion in his choosing between the plaintiffs' own conflicting facts.

[11]Reverend Lord died in 1954, and Waldo died on January 13, 2003.

[12]The Maffeis submitted the affidavit of an expert in canon law, that Canon 515, § 2, of the Roman Catholic Code of Canon Law governs suppression of a parish. Canon 515, § 2, promulgated by Pope John Paul II in 1983, provides: "It is only for the diocesan bishop to erect, suppress, or alter parishes. He is neither to erect, suppress, nor alter notably parishes, unless he has heard the presbyteral council."

In their verified complaint, the plaintiffs state their "belie[f]" that the suppression provisions of canon law in effect in 1946, when the deed to the property was transferred, were similar to those promulgated by Pope John Paul II. Although the RCAB denies the allegation of similarity in its answer, it does not contest the fact of suppression under prevailing canon law. Whether the 1983 code or any other code of canon law authorizes suppression of a parish is not relevant to our resolution of the claims in this case.

for $12,000 (representing payment of $3,000 to each of Waldo's four brothers), a price that amounted to $1,500 per acre.[13] The parties did not enter into a purchase and sales agreement, but executed a deed transferring all legal and beneficial interest in the property to the RCAB in exchange "for consideration paid." An attorney hired by the RCAB prepared the deed, which the Maffei siblings, choosing not to be represented by counsel, had the opportunity to read and then signed before a notary in Waldo's home.[14] The spouses of the four married Maffei brothers, Catherine among them, also executed the deed, relinquishing their rights of "dower and homestead."[15] The deed, in fee simple absolute, makes no reference to naming the church in honor of James. Nor does it recite any alleged agreement concerning using the property "forever" as a church. The deed contains no reservation of rights or right to enter or retake the property. The Maffeis claimed that the family never would have executed the deed had they been informed that the property might not always be used as the locus of a church named for James.

In 1950, the RCAB erected St. James as a parish, and by 1958, a new St. James Church (renamed St. James the Great to avoid confusion with another church in the area) was constructed. Waldo and Catherine, founding parishioners, became heavily involved in the affairs of St. James. Waldo paid $10,000 for the

[13]The Maffeis alleged that similar property sold for $2,000 to $2,200 per acre at the time. This estimate is consistent with the statements of Reverend Lord to his superior in a letter dated September 16, 1946, in which, among other things, Reverend Lord states that similar land "usually sells at around $2,000 an acre. For a tract just across the street from the one I want (and inferior to it) the owner demands $2,400 an acre. The Town of Wellesley recently paid $2,200 for one acre of land adjacent to the tract I am bargaining for." Reverend Lord also stated in the letter that, according to a member of the planning board of Wellesley whom he consulted, "$12,000 is really a very cheap price for the Maffei land."

[14]Although the verified complaint states that counsel hired by the RCAB prepared the deed and that the Maffei family was not represented by counsel when they sold the property, Catherine in her sworn statement states that one of the Maffeis' neighbors, who was an attorney, prepared the deed at their request ("we got ahold of [the attorney], and she put everything together") and was present when the deed was executed. The neighbor, identified by Catherine in her sworn statement as the lawyer who prepared the deed, is named in the verified complaint only as the person who notarized the deed.

[15]In her sworn statement, Catherine testified that she did not read the deed, relying instead on Waldo's business acumen in such matters.

church altar, and he and his wife frequently volunteered their time and resources to benefit the parish.[16] In 2002, the church served approximately 900 families.

By that time, however, questions, real or rumored, had arisen concerning St. James's continued viability. In 1999, an article appeared in a local newspaper stating that the RCAB had included St. James on a list of parish churches to be closed. Shortly thereafter, Reverend George Vartzelis, then pastor of St. James, assured his congregation that the article was incorrect and that St. James would remain open. In June, 2002, the RCAB launched a capital endowment campaign in which each of its 368 parishes was to raise a specific amount in donations. St. James's target was $370,000. In conjunction with the capital campaign, Reverend Vartzelis sent solicitation letters to his parishioners requesting funds for the RCAB campaign, and also asked for $35,000 in donations to refurbish St. James "to keep it as good as it needs to be and as we all want it to be now and for the future." Reverend Vartzelis, at the time he made these statements, had no knowledge of the RCAB's plans, if any, to close the church. Based on Reverend Vartzelis's representation that a gift would benefit St. James "now and for the future," Hanafin, then a retiree in her eighties, donated $35,000 to the church. Hanafin states in her affidavit: "If I had known that the Archdiocese . . . was giving any consideration to closing St. James, I would not have made the gift of $35,000."

Reverend Vartzelis retired in the spring of 2003, and the RCAB replaced him with an administrator, an interim position, rather than with a pastor. In January, 2004, the RCAB required each "cluster"[17] of parishes to investigate and report on which parishes in the cluster might be closed in a "reconfiguration" plan. The Wellesley-Weston cluster, to which St. James belonged, reported in their "reconfiguration response" that, while it would be best for all parishes in the cluster to remain open, St. James would be the "most feasible" church to close

---

[16]In her sworn statement, Catherine was asked whether Waldo would "have been this much involved if the church had not been named after his father." She replied: "Oh, sure, sure. Sure. We were religious. We believed in the priests and the church. We were very good Catholics."

[17]A "cluster" is an administrative unit of churches that share a common geographic location.

as it "has the smallest number of recorded families and individuals; the smallest Mass count; the smallest religious education program; and the smallest sacramental index." On October 5, 2004, the RCAB issued a decree of suppression of St. James, effective October 31, 2004. The decree reassigned the territory covered by St. James to other parishes, transferred the canonical registers of St. James to another parish, and transferred "the goods and obligations" of St. James to the RCAB.[18] The RCAB retained legal title to the property. During one of the last Masses before the church closed, Hanafin asked Reverend Vartzelis, "Father, why didn't you tell us the church was closing?" He replied, "I really didn't know it, Eileen," and he seemed, Hanafin stated in her affidavit, "visibly upset."

The plaintiffs filed their six-count verified complaint on June 8, 2005.[19] They subsequently moved for lis pendens on the property and, in light of Catherine and Hanafin's advanced age, for a speedy trial. The RCAB moved to dismiss the complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974). The judge denied the RCAB's motion to dismiss and allowed the plaintiffs' motion for lis pendens and motion for a speedy trial. Thereafter, all parties moved for summary judgment.

We turn now to the merits.

2. *Scope of review.* As the movant for summary judgment on all counts, the RCAB must affirmatively establish the absence of a triable issue as to each of the plaintiffs' claims. In deciding the motion, the judge was required to consider all factual allegations, and all reasonable inferences drawn therefrom, favor-

---

[18]The plaintiffs have alleged that, in accordance with canon law, a group calling itself "the Friends of St. James the Great Parish" appealed from the decree of suppression to the RCAB and, when that appeal failed, next appealed to the Vatican. The plaintiffs are among the signatories to the appeal to the Vatican. The present status of the religious appeal is unknown; it has no bearing on the questions of civil law we decide today.

[19]Count I sought declaratory and injunctive relief to, among other things, declare the alleged oral agreement between the RCAB and the Maffei family enforceable, and for reversion of the property to the family; count II sought to impose a resulting trust on the RCAB in the Maffeis' favor to enforce a conditional gift; count III was a claim by the Maffeis for "breach of fiduciary duty and constructive trust"; count IV was the Maffeis' breach of contract claim; count V, their claim for negligent misrepresentation; and count VI, Hanafin's claim for negligent misrepresentation.

ably for the plaintiffs. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). We review the judge's legal conclusions de novo. *Ritter* v. *Massachusetts Cas. Ins. Co.*, 439 Mass. 214, 215 (2003).

Our consideration of the plaintiffs' appeal is also informed, and limited, by bedrock principles of the First Amendment. It is axiomatic that the First Amendment protects an individual's freedom to worship, or not to worship, as he or she chooses. It also places beyond our jurisdiction disputes involving church "doctrine, canon law, polity, discipline, and ministerial relationships." *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 579 (2002). See *Hiles* v. *Episcopal Diocese of Mass.*, 437 Mass. 505, 515 (2002); *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 61, cert. denied, 444 U.S. 899 (1979). Among the religious controversies off limits to our courts are promises by members of the clergy to keep a church open. See *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 785, cert. denied, 511 U.S. 1142 (1994) ("To inquire into an alleged promise by the Bishop to keep a parish open or refrain from merging it with another parish was an impermissible intrusion into the Bishop's ecclesiastical authority"). See also *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich*, 426 U.S. 696, 721 (1976) ("reorganization of the Diocese involves a matter of internal church government, an issue at the core of ecclesiastical affairs").

This is not to say that every property dispute between a church and its adherents is beyond the review of civil courts. "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones* v. *Wolf*, 443 U.S. 595, 602 (1979). But even in the property arena, we must proceed with caution, for the First Amendment also "circumscribes the role that civil courts may play in resolving church property disputes." *Id.*, quoting *Presbyterian Church in the U.S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969). We have jurisdiction over church property disputes if and to the extent, and only to the extent, that they are capable of resolution under "neutral principles of law" — which the United

States Supreme Court has defined as "well-established concepts of trust and property law familiar to lawyers and judges." *Jones* v. *Wolf, supra* at 603. See *Fortin* v. *Roman Catholic Bishop of Worcester, supra* at 786; *Mitchell* v. *Albanian Orthodox Diocese in Am., Inc.,* 355 Mass. 278, 282 (1969).

The standards enunciated above clearly forbid our consideration of the religious obligations, if any, of a clergy member to his or her congregants, or of the "trust and confidence" that may be engendered in congregants solely by virtue of the clergy's religious authority. We certainly must also stand apart from questions of canon law: we must avoid inquiry into whether the RCAB, Reverend Lord, or Reverend Vartzelis owed a fiduciary, confidential, or any other duty to discuss with the plaintiffs the nature of property ownership under canon law. We may not inquire into the ecclesiastical authority of Reverend Vartzelis and Reverend Lord to bind the RCAB by making oral promises about church property, to examine the actual status or disposition of church property under canon law, or to attempt to interpret any particular provision of canon law. As a matter of constitutional law, such disputes are beyond our authority. *Alberts* v. *Devine,* 395 Mass. 59, 72, cert. denied sub nom. *Carroll* v. *Alberts,* 474 U.S. 1013 (1985).

In this case, the RCAB did not raise the constitutional issue of jurisdiction. The judge in the Superior Court, however, properly noted the necessary restraint in analyzing the plaintiffs' ownership claims. For the purposes of this appeal, we shall presume jurisdiction strictly limited by the constitutional principles stated above.

3. *Standing.* As an initial matter, the judge rejected for lack of standing the Maffeis' claim that they gave the property to the RCAB in trust. He ruled that, because the Maffeis' interests in the alleged charitable trust were indistinguishable from those of other parishioners of St. James, only the Attorney General was authorized to prosecute claims to enforce the trust's provisions. See G. L. c. 12, § 8.[20] Although it is not clear whether the judge's ruling on standing applied also to Hanafin,

---

[20]General Laws c. 12, § 8, provides: "The attorney general shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration

on appeal the defendant urges that we also deny Hanafin stand-
ing to bring her claim. We shall accordingly address standing as
to all of the plaintiffs. Although we agree with the judge that
the standing of some of the plaintiffs is problematic, we do so
for reasons different from those he articulated.

Turning first to the judge's reasoning, it is clear that the
plaintiffs have alleged individual stakes in this dispute that
make them, and not the Attorney General, the parties to bring
suit, assuming no other impediments to their standing to pursue
this litigation. A "gift to a church generally creates a public
charity." *Sears* v. *Attorney Gen.*, 193 Mass. 551, 555 (1907).
"[I]t is the exclusive function of the Attorney General to correct
abuses in the administration of a public charity by the institu-
tion of proper proceedings. It is his duty to see that the public
interests are protected . . . or to decline so to proceed as those
interests may require." *Lopez* v. *Medford Community Ctr., Inc.*,
384 Mass. 163, 167 (1981), quoting *Ames* v. *Attorney Gen.*, 332
Mass. 246, 250-251 (1955). However, a plaintiff who asserts an
individual interest in the charitable organization distinct from
that of the general public has standing to pursue her individual
claims. *Lopez* v. *Medford Community Ctr., Inc., supra.* See
*Weaver* v. *Wood*, 425 Mass. 270, 276 (1997) (standing arises
from claim of "personal right that directly affects the individual
member").

In this case, the plaintiffs' claims are readily distinguishable
from those of the general class of parishioner-beneficiaries. The
Maffeis allege that they conditionally gifted their land to the
RCAB and that they personally have an equitable reversionary
interest in the property as a result of the actions of the RCAB.
Hanafin claims that she lost substantial personal funds as the
result of the RCAB's negligent misrepresentation to her. These
claims are personal, specific, and exist apart from any broader
community interest in keeping St. James open. See *id.* The
plaintiffs have alleged personal rights that would, in the ordinary
course, entitle them to standing.

However, the issue of standing for the Maffei plaintiffs is

thereof." The Attorney General's exclusive authority under the statute
encompasses charitable "assets" in general as well as charitable "funds." See
*Weaver* v. *Wood*, 425 Mass. 270, 275 (1997).

clouded by the fact that they have brought suit as the sole trustees of the Waldo M. Maffei Revocable Trust (trust),[21] and as the trust's sole beneficiaries. But the real property they seek to recover is property that Waldo, in his individual capacity, voluntarily alienated from his estate in 1946, possibly before the trust was created, see note 4, *supra*, and almost sixty years before the trust proceeds became distributable to the trustees at Waldo's death in 2003.[22] The RCAB raises the issue of the trustees' standing only in passing, without citation. See, e.g., *Greater Media, Inc.* v. *Department of Pub. Utils.*, 415 Mass. 409, 418 (1993) (cursory argument not supported by meaningful authority does not rise to level of proper appellate argument). We address the merits of the trustees' argument because the RCAB has effectively waived any claim of standing, see *John Hancock Mut. Life Ins. Co.* v. *Banerji*, 447 Mass. 875, 887 n.20 (2006), because the Maffei plaintiffs raise substantial issues that may arise again, see *Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 738-739 n.1 (1994), and because Catherine's individual claims must in any event be adjudicated.

4. *Constructive trust.* A constructive trust is a flexible tool of equity designed to prevent unjust enrichment resulting from fraud, a violation of a fiduciary duty or confidential relationship, mistake, or "other circumstances" in which a recipient's acquisition of legal title to property amounts to unjust enrichment.[23] *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 789, cert. denied, 511 U.S. 1142 (1994). See *Nessralla* v. *Peck*, 403 Mass. 757, 762-763 (1989); *Kelly* v. *Kelly*, 358 Mass. 154, 156

---

[21]The Maffeis allege that, under the second article of the will of Waldo, who died in January, 2003, the residue of his estate is distributable to the trustees, being Catherine and her daughter, Maureen Maffei.

[22]Catherine Maffei has also brought suit in her individual capacity. She, like Hanafin, has standing in her individual capacity, having given up her rights of dower and homestead in the property in reliance, she alleges, on Reverend Lord's "assurance" that the property would always be used as a church in memory of her father-in-law. She specifically alleges that she would not have given up those rights, nor would she have executed the deed transferring the property to the RCAB, had that assurance not been given to her.

[23]In cases where no express trust exists, a judge may employ the equitable remedies of constructive or resulting trust to avoid injustice to the grantee of an interest in real property. See generally J.R. Nolan & L.J. Sartorio, Equitable Remedies § 351 (2d ed. 1993).

(1970) (listing circumstances giving rise to constructive trust). See generally 5 A.W. Scott & W.F. Fratcher, Trusts § 462 (4th ed. 1989). A constructive trust may arise even if the parties did not intend to convey the real estate in trust. *Yamins* v. *Zeitz*, 322 Mass. 268, 272 (1948). The Maffeis assert that they have established a prima facie claim to a constructive trust in their favor as to every theory under which a constructive trust may be imposed: fiduciary or confidential relationship, fraud, mutual mistake, and unconscionability and unjust enrichment. The judge rejected their claims, and for the reasons we explain below, his decision was sound. We begin first with the breach of duty claim.

a. *Constructive trust: breach of fiduciary duty — confidential relationship.* The court may impose a constructive trust where one acquires an interest in property in breach of a legal duty to one who has granted that interest. See *Fortin* v. *Roman Catholic Bishop of Worcester*, supra at 789. The duty may be a fiduciary duty, but it need not be a fiduciary duty that is established as a matter of law, such as that of attorney to client or trustee and beneficiary. A fiduciary duty may arise from the circumstances. See, e.g., *Patsos* v. *First Albany Corp.*, 433 Mass. 323, 331-332 (2001) (plaintiff's affidavit raised sufficiently specific allegations that would permit jury to find that "a full relation of principal and broker" arose between plaintiff client and defendant broker, giving rise to broker's fiduciary duties to client); *Warsofsky* v. *Sherman*, 326 Mass. 290, 293-294 (1950) (where loan applicant supplied confidential information to defendant banker, who "impliedly at least" understood the terms on which applicant's information was given and undertook to comply with those terms, banker stood in relation toward applicant and could not use information for personal gain). A constructive trust may also be appropriate to remedy the breach of duty arising from a relationship of "trust and confidence" that is not a fiduciary relationship established as a matter of law, such as a relationship in which one party confides confidential information to one who then uses that information for his own benefit and to the declarant's harm. See, e.g., *Sullivan* v. *Rooney*, 404 Mass. 160, 163 (1989) (fiduciary relationship between unmarried cohabitants where woman reasonably relied on defendant companion's promises to take care of her

and defendant knew of and accepted plaintiff's trust in him); *Broomfield* v. *Kosow*, 349 Mass. 749, 757 (1965) (abuse of "influence springing from that trust and confidence to obtain personal advantage" at expense of another warrants imposition of constructive trust). The confidential relationship, however, must comprise more than "[m]ere respect for the judgment of another or trust in his character . . . ." *Meskell* v. *Meskell*, 355 Mass. 148, 151 (1969), quoting *Comstock* v. *Livingston*, 210 Mass. 581, 584 (1912). Moreover, a constructive trust "is not imposed where a recipient has given value or had no notice of the violation of duty." *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 544 (1997).

Here, the Maffeis assert that the RCAB, acting through its designated agent, Reverend Lord, owed them a fiduciary duty to apprise the family of the possibility of suppression and to draft a deed reflecting what they allege was the parties' understanding of their conditional transfer of interest in the property. Alternatively, the Maffeis argue that their relationship with Reverend Lord and the RCAB created a cognizable relationship of "trust and confidence" breached by these actions.

The fatal flaw in these arguments is evident in the Maffeis' contention that the RCAB's legal duties flow principally from the parties' shared religious affiliation. As they allege in their verified complaint, the Maffeis "reposed absolute trust and confidence in Reverend Lord, as he was the Pastor of a Catholic Church, and absolute trust in his promise that the land would forever be used as a Church . . . . Reverend Lord understood that the Maffeis trusted him, as he was a Priest and a Pastor of a Catholic Church." Or, as Catherine testified in her sworn statement when asked whether Reverend Lord's status as a priest had "any effect on your believing him" that the property would remain a church in honor of James: "Of course. . . . Everything the priests said, we trusted him very dearly. We really did. So what Father Lord said, he was a gentleman and a wonderful priest, and we believed everything he said." Or, as the Maffeis assert in their brief on appeal: there "must" be a relationship of trust and confidence between a diocese and the members of the faith it purports to serve; "one's religion creates faith and trust that [the] Church is asking [for donations] in

good faith."A ruling that a Roman Catholic priest, or a member of the clergy of any (or indeed every) religion, owes a fiduciary-confidential relationship to a parishioner that inheres in their shared faith and nothing more is impossible as a matter of law.[24] Such a conclusion would require a civil court to affirm ques-

[24]The Maffeis are correct that Massachusetts courts have "not directly addressed the question of whether a pastor-communicant relationship is per se a confidential one when undue influence is alleged." See *Dovydenas* v. *The Bible Speaks*, 869 F.2d 628, 641-642 (1st Cir.), cert. denied, 493 U.S. 816 (1989) (court need not decide whether under Massachusetts law confidential relationship between parishioner and communicant exists where other evidence of record establishes such relationship). They have not persuaded us to recognize such a relationship as a matter of law in all circumstances by citing decisions from other jurisdictions that they argue do so. One of these cases is not relevant to the circumstances of adult parishioners. See *Koenig* v. *Lambert*, 527 N.W.2d 903, 906 (S.D. 1995), overruled on other grounds by *Stratmeyer* v. *Stratmeyer*, 567 N.W.2d 220 (S.D. 1997) (relationship between altar boy and diocese and its members one of trust and confidence because defendant clerics "were not only acting as members of the church, they were also acting as agents or representatives of God," and plaintiff altar boy was taught to "trust and respect" them). The other cases on which they rely concern circumstances of repeated, affirmative false statements by clergy to the plaintiff that would constitute fraud apart from any religious affinity between the parties. The cases cited provide scant support for the premise that a member of the clergy is obligated as a matter of law to inform a parishioner about a matter of canon law that may have some future operation on the estate granted. See *Farmer* v. *O'Carroll*, 162 Md. 431, 435 (1932) (plaintiff, who was extremely depressed and nervous, "became easily subject to the undue and dominating influence" of cleric who repeatedly and with fraudulent statements importuned her to turn over her property); *Corrigan* v. *Pironi*, 48 N.J. Eq. 607, 610 (1891) (transfer of land to priest by "ignorant, eccentric, and entirely illiterate" elderly woman); *Brown* v. *Divine*, 173 Misc. 1029, 1030 (N.Y. Sup. Ct.), aff'd, 260 A.D. 443, 445 (N.Y. 1940) (spiritual advisor who falsely represented that he would deposit plaintiff's money in his "Heavenly Treasure" and return it to her on demand holds funds as constructive trustee); *Nelson* v. *Dodge*, 76 R.I. 1, 12 (1949) (cult-like religious figure who exercised near-total dominance over congregants and effected "complete surrender" of plaintiff's will abused confidential relationship with plaintiff-parishioner who turned over substantial property to cleric).

The Maffeis correctly state that these decisions contain statements that one who acts in the capacity of "spiritual ascendancy" over a donor has a confidential relationship to the donor that requires the spiritual advisor to justify any gift made to him or her by the donor. See, e.g., *Farmer* v. *O'Carroll, supra* at 444 ("relation of spiritual adviser and a member of his congregation is generally regarded as of a confidential nature"); *Corrigan* v. *Pironi, supra* at 609 ("spiritual ascendancy" of Roman Catholic priest over Roman Catholic layperson "in a legal point of view is deemed confidential"); *Brown* v. *Divine, supra* (proof that defendant religious leader was "spiritual adviser" to plaintiff

tions of purely spiritual and doctrinal obligation. The ecclesiastical authority of the RCAB and Reverend Lord over the parishioners, the ecclesiastical authority of the RCAB over Reverend Lord, the state of canon law at the date of the property transfer, the knowledge of the canon law that might reasonably be attributed to the RCAB and Reverend Lord in 1946, the canonical obligation of Reverend Lord, if any, to inform parishioners of canonical law —all of these inquiries bearing on resolution of the Maffeis' fiduciary claims would take us far afield of "neutral principles of law."[25] See *Jones* v. *Wolf*, 443 U.S. 595, 602 (1979). We decline to hold that, as a matter of civil law, the relationship of a member of the clergy to his or her congregants, without more, creates a fiduciary or confidential relationship grounded in their shared religious affiliation for which redress is available in our courts.

Nor, apart from the constitutionally impermissible grounds urged on us by the Maffeis, is there other evidence of a fiduciary or confidential relationship between the parties in the transaction for sale of the property. This is not a case where the RCAB or Reverend Lord allegedly undertook to manage property solely for the Maffeis' benefit or acted without their prior authorization, cf. *Patsos* v. *First Albany Corp.*, 433 Mass. 323, 336-337 (2001), or used confidential information of the Maffeis to effect the sale. Cf. *Broomfield* v. *Kosow*, 349 Mass. 749, 757 (1965). Nor can the clearly aspirational oral statement that the property would "forever" be a church in honor of James, without more, create an actionable duty breached by the church's closure. See *Meskell* v. *Meskell*, 355 Mass. 148, 151 (1969). On the record before us, the breach of duty claim cannot be sustained.

places on defendant burden of justifying acceptance and use of plaintiff's money and property); *Nelson* v. *Dodge, supra* at 12-14, citing *Corrigan* v. *Pironi, supra* at 609 (equity will come to aid of one who has parted with property while under such influence, even absent showing of fraud or "imposition"). However, these decisions predate the United States Supreme Court's First Amendment jurisprudence as reflected in, for example, *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich*, 426 U.S. 696 (1976), and *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, cert. denied, 511 U.S. 1142 (1994), and we do not consider them weighty authority.

[25]In light of what we have said concerning the First Amendment, we decline the plaintiffs' invitation to take "the opportunity to outline the responsibilities of religious organizations to their members concerning the necessary information to provide their worshippers before accepting their contributions."

b. *Constructive trust: fraud.* The Maffeis argue, in essence, that because Reverend Lord negotiated for the property from a position of superior knowledge of the canon law of suppression, his statement that the property would be used "forever" for a church honoring James Maffei was an actionable "misrepresentation of future facts" that should be remedied by a reversion of the property to the Maffeis. The Maffeis' appeal to the authority of *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722 (1974), *S.C.,* 368 Mass. 811 (1975), and *Gopen* v. *American Supply Co.,* 10 Mass. App. Ct. 342 (1980), to support their argument is unavailing. In the *Cellucci* case, the court ordered specific performance of an agreement to sell real estate where the agent of the defendant-purchaser made representations of fact and law designed to induce the plaintiff to refrain from negotiation with the defendant's competitor for sale of the property. Among the misstatements was that the purchase and sale agreement between the parties meant that the defendant had purchased the site. *Cellucci* v. *Sun Oil Co., supra* at 730-731. In the *Gopen* case, the defendant parent company was found liable to a commercial lessor for misstating its subsidiary's financial condition, thereby inducing the lessor to enter into a lease with the subsidiary. *Gopen* v. *American Supply Co., supra* at 345. In both cases cited, the actionable misrepresentation was "made by one possessed of superior knowledge to take advantage of the relative ignorance of another." *Cellucci* v. *Sun Oil Co., supra* at 731. See *Gopen* v. *American Supply Co., supra.* In both cases cited, the fraud occurred at the time the property was transferred. See *Pietrazak* v. *McDermott,* 341 Mass. 107, 109-110 (1960) (home builder's statement that "there would be no water in the cellar," although not made with intent to deceive, would support deceit action where statement was made as though with personal knowledge, was capable of being known by builder, and was material to plaintiffs' decision to buy house). In each case the statements were made with the clear knowledge that they were untrue or with the false implication that the speaker was speaking from personal knowledge.

Here, considering the Maffeis' claims under neutral principles of law, the record is devoid of any evidence of Reverend Lord or the RCAB's intent to mislead or to deceive the Maffeis.

There is no allegation that applicable canon law was confidential and not accessible to the plaintiffs. Moreover, the alleged oral promise of a church existing in perpetuity and in James's honor cannot fairly be characterized as a verifiable statement when made, and is thus materially different from, for example, a statement about corporate structure and signing authority, see, e.g., *Cellucci* v. *Sun Oil Co.*, *supra*, or a statement about the financial condition of one's subsidiary, see, e.g., *Gopen* v. *American Supply Co.*, *supra*. An action for deceit will not lie for statements that are "merely a matter of opinion, estimate, or judgment." *Powell* v. *Rasmussen*, 355 Mass. 117, 118 (1969), quoting *Chatham Furnace Co.* v. *Moffatt*, 147 Mass. 403, 404 (1888). Finally, a "subsequent refusal to carry out an oral promise, standing by itself, is not . . . fraud" remediable by a constructive trust. J.R. Nolan & L.J. Sartorio, Equitable Remedies § 351, at 496 (2d ed. 1993). Equity may not rest on such a slender reed. There was no error.

c. *Constructive trust: mutual mistake.* For the reasons advanced *supra*, we agree with the judge in the Superior Court that the Maffeis have "no reasonable expectation" of proving mutual mistake as to the parties' understanding of the legal status of the property sale.[26] They have advanced no evidence beyond speculation to support the claim that Reverend Lord did not intend an outright purchase of the property for use according to the RCAB's needs.[27] Cf. *Ide* v. *Bowden*, 342 Mass. 22

---

[26] The Maffeis argue that the judge erroneously shifted to them the burden on summary judgment of establishing Reverend Lord's knowledge or lack of knowledge of the canon law of suppression. We see no error, where the plaintiffs' allegations concerning Reverend Lord's knowledge and state of mind were couched in highly speculative and conditional terms ("It is likely" that Reverend Lord knew that the proposed church would be subject to suppression, and "[i]f Reverend Lord did not understand that the provisions of Canon law" authorized suppression, then parties transferred property based on mutual mistake). See *Fortin* v. *Roman Catholic Bishop of Worcester*, 416 Mass. 781, 790, cert. denied, 511 U.S. 1142 (1994).

[27] A letter from Reverend Lord to his superiors in September, 1946, speaks only of a sale of the property to the RCAB, and makes no mention of any promise of naming the church for James or using the site as the locus of a church "forever." The reply letter from the chancellor of the archdiocese to Reverend Lord authorizing him to purchase the property also makes no reference to the alleged oral promise.

(1961) (mutual mistake as to intention to divide property at State line remediable by constructive trust).

d. *Constructive trust: unconscionability and unjust enrichment.* It is unsupportable for the Maffeis to contend that the RCAB purchased the property for an unconscionably low price of $1,500 per acre where they do not allege that the RCAB would have refused to pay them $3,000 each for their interest, as was paid to the other Maffei children. Had Waldo and his sister sold their interests as their siblings did, rather than making a gift of them, the RCAB may have had to pay more than the $2,000-$2,200 per acre alleged to be the going price for comparable land.[28] Where the record establishes that two of the Maffei siblings were willing to transfer voluntarily and that, partly as a result of their donated interests, the RCAB paid a low, but not unconscionable, price for the property; where the deed unambiguously granted the RCAB full legal and equitable interest in the property; and where the Maffeis have not shown a triable issue on their claims of fraud, breach of duty, or mutual mistake, they are not entitled to a constructive trust on generalized allegations of unconscionability or unjust enrichment. Cf. *White* v. *White*, 346 Mass. 76, 79-80 (1963) (unjust enrichment found and constructive trust imposed by court where "the words used in the instrument of transfer resulted in a situation which was materially at variance with [the parties'] common intention"). The judge properly granted summary judgment on this claim.

5. *Resulting trust.* The judge also correctly found that the Maffeis failed to demonstrate a triable issue on their cause of action for a resulting trust. A resulting trust may be imposed to enforce a conditional gift. It typically occurs where "a transfer of property is made to one person and the purchase price is paid by another; in such a case a trust results in favor of the person who furnished the consideration." *Meskell* v. *Meskell*, 355 Mass. 148, 150 (1969). Unlike a constructive trust, a resulting trust pivots on the key element of intention. The party who furnishes consideration must not intend to do so as "a gift or advance-

---

[28]At a total purchase price of $18,000, representing a payment of $3,000 to each sibling, the price for each acre of the eight-acre property would be in excess of $2,200.

ment" to the one who takes legal title to the property. See *Fortin* v. *Roman Catholic Bishop of Worcester, supra* at 789; *Lewis* v. *Mills,* 32 Mass. App. Ct. 660, 663 (1992). See also 5 A.W. Scott & W.F. Fratcher, Trusts § 462.1 (4th ed. 1989). Moreover, a "resulting trust must arise, if at all, at the time of the execution of the deed." *Fortin* v. *Roman Catholic Bishop of Worcester, supra,* quoting *Dwyer* v. *Dwyer,* 275 Mass. 490, 494 (1931).

The Maffeis' case for a resulting trust is infirm in several respects. First, their contention that the property was given as a "conditional gift" is belied by the clear and unambiguous words of the deed, which the Maffeis do not claim they had no opportunity to read prior to signing before a notary. See *Fortin* v. *Roman Catholic Bishop of Worcester, supra.* Second, they have not advanced any evidence that, at the time the deed was executed "for consideration paid," the parties intended anything other than a complete transfer of all legal and beneficial interest in the property from the Maffeis to the RCAB. Neither the verified complaint nor Catherine's sworn statement alleges that anyone told Reverend Lord that the family required, or even expected, the property to be deeded back to them if it were no longer used as a church. The judge did not err in granting summary judgment to the RCAB on this claim.

6. *Breach of contract.* Summary judgment was appropriate on the Maffeis' breach of contract claim. We have noted the deed's completeness and lack of ambiguity. Moreover, the terms of the alleged oral contract were never reduced to writing and the Maffeis are thus barred from seeking to enforce the oral agreement by the Statute of Frauds. See *Michelson* v. *Sherman,* 310 Mass. 774, 775 (1942) (oral contract for purchase of real estate cannot be enforced against party thereto unless party or party's agent has signed written memorandum reciting essential terms with reasonable certainty); G. L. c. 259, § 1.[29]

---

[29]General Laws c. 259, § 1, provides, in relevant part: "No action shall be brought . . . [u]pon a contract for the sale of land, tenements or hereditaments or of any interest in or concerning them . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized."

The Maffeis nevertheless argue that the RCAB is estopped from asserting the Statute of Frauds based on "facts . . . similar" to those of *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722 (1974), *S.C.*, 368 Mass. 811 (1975).[30] We disagree. It is sufficient to note that the RCAB is shown to have paid a fairly negotiated price for the property and that the record is devoid of any evidence that the parties agreed that the property would revert to the Maffeis if it were no longer the site of a church. Estoppel is not warranted. The RCAB was entitled to summary judgment on the contract claim.

7. *The Maffeis' negligent misrepresentation claim.* A defendant is liable for negligent misrepresentation if "in the course of his business . . . [he] supplies false information for the guidance of others in their business transactions" on which the others justifiably rely, 'if he fails to exercise reasonable care or competence in obtaining or communicating the information.' " *Fox* v. *F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 587 (1996), quoting Restatement (Second) of Torts § 552(1) (1977). The Maffeis' action for negligent misrepresentation rests on allegations that the RCAB failed to exercise reasonable care by not informing the Maffeis about the possibility of suppression, and that the RCAB was negligent in preparing a deed that did not reflect the actual terms of the parties' agreement that the property would revert to the Maffeis if it no longer held a church. The First Amendment, as we have discussed, prohibits us from addressing the first averment; the lack of any evidentiary support in the record, as we have also discussed, dooms the second allegation. The judge did not err in granting summary judgment on this claim.

8. *Hanafin's negligent misrepresentation claim.* Hanafin claims that the RCAB acted negligently in failing to inform Reverend Vartzelis of its plans to close St. James when it knew

[30]Estoppel may prevail against a Statute of Frauds defense where the litigant claiming estoppel proves: "(1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct . . . . (3.) Detriment to such person as a consequence of the act or omission." *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 728 (1974), *S.C.*, 368 Mass. 811 (1975), quoting *Industrial Bankers of Mass., Inc.* v. *Reid, Murdoch & Co.*, 297 Mass. 119, 124 (1937).

he would be soliciting funds in 2002 to sustain the church "now and for the future." The claim cannot be sustained. First, as the judge noted, there is no evidence that Reverend Vartzelis used Hanafin's donation for anything other than his stated purpose: to refurbish St. James. Second, Hanafin has not shown that Reverend Vartzelis failed to exercise reasonable care or competence in using the phrase "for the future" in soliciting funds. See *Fox* v. *F & J Gattozzi Corp.*, *supra.* Indeed, Reverend Vartzelis solicited funds to refurbish St. James in 2002. As to the RCAB, it was not until January, 2004, that the Wellesley-Weston "cluster" recommended closing St. James, and not until October, 2004, that St. James was suppressed. There is, in short, no evidence that, in June, 2002, Reverend Vartzelis knew that the St. James would be suppressed two years later after a lengthy review process, although he and, presumably, Hanafin were aware of rumors about St. James's closure as early as 1999. Hanafin's negligence action was properly dismissed on summary judgment.

*Judgment affirmed.*