BENJAMIN F. KUBILIUS & others *vs.* HAWES UNITARIAN CONGREGATIONAL CHURCH & others.

Suffolk.    December 2, 1947. — April 30, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, WILKINS, & SPALDING, JJ.

*Corporation,* Members, By-laws, Religious corporation. *Equity Jurisdiction,* Internal affairs of organization. *Waiver.*

A contention, that the plaintiffs had no standing to maintain a suit in equity against a religious corporation to enforce recognition of their rights as voting members because of failure on their part to exhaust their remedy within the corporation, was without merit where the by-laws of the corporation provided no such remedy and the defendant suggested none.

By-laws of a religious corporation, organized under the laws of the Commonwealth, requiring the standing committee annually to revise lists prepared by the clerk of "active" members, who were entitled to notice of corporate meetings, and of "elected" members, and empowering the committee in their discretion to amend the lists "by striking from, or adding to the same . . . Provided, however, that the name of every member shall be borne upon one of said lists until withdrawn by written resignation, or until the name of any such member is struck therefrom by vote of the corporation after proceedings in conformity to law," gave the committee no power to establish lists of voting members and nonvoting members and thereby to deprive those on a nonvoting list of the right to participate in corporate meetings.

Full voting membership was not attained by one duly elected to membership in a religious corporation organized under the laws of the Commonwealth until he had complied with a requirement of a by-law that one so elected "shall become a member upon signing the by-laws of the corporation."

Evidence did not warrant a finding of waiver of a by-law of a religious
corporation respecting signing of the by-laws by one elected to member-
ship, even if it were assumed that it could be waived.

In a suit in equity against a religious corporation organized under the
laws of the Commonwealth, the final decree should have established
that under the by-laws of the corporation persons elected to member-
ship who also had signed the by-laws were entitled to voting rights
as members, but persons elected who had not signed the by-laws were
not so entitled.

BILL IN EQUITY, filed in the Superior Court on March 6,
1945, and afterwards amended.

The case was heard on demurrers by *Goldberg, J.,* and on
the merits by *Hudson, J.*

*A. G. Sleeper,* for the individual defendants.

*S. H. Rudman,* for the plaintiffs.

SPALDING, J.   The principal objectives of this bill in equity
are to restrain the defendants from interfering with or
changing the status of the plaintiffs, who claim to be mem-
bers of the Hawes Unitarian Congregational Church (here-
inafter sometimes called the church), and to compel the de-
fendants to hold an annual meeting of the church at which
the rights of the plaintiffs and those similarly situated will
be recognized. [1]   Demurrers to the bill filed by the church
and by the defendants Carbone, Cameron and Corliss were
overruled by interlocutory decrees from which these de-
fendants appealed.   From a final decree granting the relief
hereinafter mentioned, all of the defendants appealed.   The
evidence is reported and the judge made voluntary findings
of facts.

Facts relevant to this appeal may be summed up as fol-
lows:   The church, a religious corporation organized under
the laws of this Commonwealth, was established prior to
1889.   Its place of worship is located in South Boston.   The
church derives financial support from a substantial trust
fund, known as the "Hawes Fund," which was established
under the will of John Hawes. [2]   In 1889 it adopted by-laws

---

[1] In the bill the plaintiffs stated that the suit was brought "in their own
behalf as members of the church, and on behalf of and at the request of other
members of said church too numerous to join as parties plaintiff."

[2] The trustees of the "Hawes Fund" were named as defendants in the
bill but the final decree granted no relief against them.

which stated that its object was "the maintenance of the public worship of God, in accordance with the faith and methods of Unitarian Christians."

During the period when the events which gave rise to this controversy occurred, Theodore De Luca was pastor of the church. In 1943 the attendance at its Sunday services had dwindled to six persons. In June of that year, upon learning that the St. John's Lithuanian Methodist Episcopal Church, located nearby, was closing down, De Luca approached its pastor, the plaintiff Kubilius, in an effort to interest him and his parishioners in joining the Hawes church. In September De Luca, with the permission of Kubilius, addressed the latter's parishioners in their own church in an effort to convert them to the Unitarian faith. At that meeting De Luca told them that if they joined the church they would be granted the privilege of having services in the Lithuanian language. After several conferences with De Luca, Kubilius on October 24, 1943, applied for membership in the church. On November 7, 1943, at a special meeting of the church Kubilius was elected to membership and on the following day he received a formal notification of his election from the clerk. Subsequently he signed the by-laws. Shortly after his election, Kubilius presented to the standing committee of the church a list containing the names of forty persons whom he recommended as suitable for membership in the church. All of these persons were described as Lithuanians and nearly all of them had been former parishioners of Kubilius. At a corporation meeting of the church held on November 21, 1943, all of the persons sponsored by Kubilius were elected to membership by a unanimous vote, and the clerk, pursuant to an instruction contained in the vote, notified them of their election shortly thereafter. The forty thus elected, Kubilius, and one Miller, who was subsequently elected to membership, will hereinafter be called the new group.

At a special Sunday service held on December 26, 1943, in which prominent Unitarian clergymen participated, the new group were welcomed into the church. On the following Sunday a special communion service was held and a "regular

ritualistic communion" was administered to the new group
and the old members in a combined service. Commencing
on January 9, 1944, services in the Lithuanian language, fol-
lowing the regular service in English, were conducted each
Sunday by Kubilius. These services were discontinued in
June, 1944, by order of the standing committee of the
church. "The members of the new group continued to at-
tend services at the . . . church and did not attend the
services of any other religious organization and they desire
to be voting members of the . . . church."

Pertinent provisions of the by-laws are as follows:
Article 4 provides for the election of new members at a meet-
ing of the corporation; "and if a majority of the members
present at the meeting vote to admit, *the applicant shall
become a member upon signing the by-laws of the corporation*"
(emphasis supplied). Article 5 provides that the annual
meeting of the corporation shall be held on the second
Thursday of January and regular meetings may be called
whenever the standing committee so direct. "Members of
the corporation shall be notified of all such meetings as here-
inafter provided." Article 6, as amended, provides that the
clerk, under the direction of the standing committee, shall
prepare and keep a list of the members of the corporation
"to be known as the list of active members." Such list
"shall contain the names of those members . . . [who]
usually attend the services of the church, or do not attend
the services of any other religious organization." The clerk
is also required, under the direction of the standing com-
mittee, to prepare and keep "a list to be known as the list
of elected members." This list "shall contain the names
of all persons elected to membership in this corporation
who are supposed to be living at the time the list is prepared,
or revised . . ., whose names are not included in the list
of active members, or who have not terminated their con-
nection with this church by a written notice of withdrawal"
(article 6). The standing committee shall annually in the
month of January revise the lists of members provided for
in article 6, and "the same may be amended by striking
from, or adding to the same, at the discretion of the com-

mittee; all such changes to be reported to the corporation at its next meeting. Provided, however, that the name of every member shall be borne upon one of said lists until withdrawn by written resignation, or until the name of any such member is struck therefrom by vote of the corporation after proceedings in conformity to law" (article 7). "The clerk shall notify by mail all persons whose names are shown on the list of active members, of all meetings of the corporation at least seven days before the dates fixed for the same" (article 8).

Originally article 9 provided that twenty members of the corporation would constitute a quorum for the transaction of business but by amendments the number was reduced to twelve and then to seven.

At a meeting of the standing committee on December 4, 1944, a list of voting members and a list of nonvoting members were drawn up for use at the annual meeting to be held on January 11, 1945. With a few exceptions, all the members of the new group were placed on the nonvoting list.

At the annual meeting held on January 11, 1945, many members of the new group were present. When, at the commencement of the meeting, they endeavored to participate in it, the clerk at the request of the moderator called the roll of members. The roll call was confined to the list of voting members and of these eight were present. The moderator then declared that the meeting was adjourned for lack of a quorum. No meeting was held.

The trial judge ruled that the establishment of the voting and nonvoting lists by the standing committee was arbitrary and was in excess of their authority under the by-laws, and that the members of the new group were entitled to participate in the meetings of the church. He found that the requirement in article 4 of the by-laws that "the applicant shall become a member upon signing the by-laws" had commonly been disregarded and that, "with relation to the members of the new group, the . . . church . . . [had] waived this provision."

A final decree was entered enjoining the defendants from

interfering with or changing the status of the members of the new group, and ordering the defendants within twenty-one days to hold an annual meeting of the church (notice of which was to be given to the members of the new group) at which the rights of such group as members of the church were to be recognized.

Whether the demurrers were rightly overruled need not be discussed. The defendants have not argued that question and it is treated as waived. *Commonwealth* v. *Dyer*, 243 Mass. 472, 508.

The contention of the defendants that the plaintiffs are not entitled to resort to the courts because of failure to exhaust their remedy within the corporation is without merit. An examination of the by-laws reveals no effective remedy within the corporation which the plaintiffs or the members of the new group could have invoked, and none is suggested by the defendants. The plaintiffs were therefore entitled to proceed as they did. *Baron* v. *Fontes*, 311 Mass. 473, 476. *Bacon* v. *Paradise*, 318 Mass. 649, 658.

The crucial question is whether the members of the new group, most of whom never signed the by-laws, ever became members of the corporation. If they did they were entitled to vote at its meetings. Under article 7 of the by-laws the standing committee could revise the lists of members and could, at their discretion, determine who should be on the active list and who were to be included in the list of "elected members." Those were the only classifications authorized by the by-laws. It is to be noted that those members not on the active list are not designated in the by-laws as "inactive" or "nonvoting"; they are called "elected members." The classification of members into "active" and "elected members" therefore is not the equivalent of a determination of who can vote and who cannot. That this is so is evidenced by the last sentence of article 7 which reads: "Provided, however, that the name of every member shall be borne upon one of said lists until withdrawn by written resignation, or until the name of any such member is struck therefrom by vote of the corporation after proceedings in conformity to law." The chief, if not the only,

distinction between the rights of "active" and "elected members" is, as shown by article 8, that the former are entitled to notice by mail of meetings of the corporation. Thus the standing committee's classification of most of the new group as "nonvoting members" was, as the judge ruled, unauthorized and did not deprive them of the right to participate in the meetings if in fact they were members of the corporation.

We are of opinion that only those persons who signed the by-laws became members of the corporation. By the provisions of article 4 the signing of the by-laws was made a condition precedent to membership. No contention is made that this was not a valid provision. See G. L. (Ter. Ed.) c. 67, § 4. See also *Taylor* v. *Edson,* 4 Cush. 522, 526. It has been said that "The relation of a member to a parish is founded on contract; and can be created in no way but by the agreement of the parties." *First Parish in Sudbury* v. *Stearns,* 21 Pick. 148, 153. The signing of the by-laws was not an idle ceremony. By signing them an applicant signified by an overt act his assent to membership in the corporation, and his willingness to be bound by them. Lacking such a provision, it would be difficult, if not impossible, for a corporation such as the church, which had no stockholders, to determine who its members were. The office of by-laws is "to regulate the conduct and define the duties of the members towards the corporation and between themselves." *Flint* v. *Pierce,* 99 Mass. 68, 70. In effect they constitute a contract between the different members and the corporation. *Bushway Ice Cream Co.* v. *Fred H. Bean Co.* 284 Mass. 239, 245, and cases cited. *Massachusetts Charitable Mechanic Association* v. *Beede,* 320 Mass. 601, 608.

If we assume that the provision under consideration was one that the corporation could waive, the evidence here does not support a finding that it was waived. The fact, as the judge found, that this requirement[1] had been "commonly disregarded" did not render it inoperative. There is noth-

---

[1] The provision was by no means totally ignored, for the evidence discloses that of those attending the church at the time of the trial nineteen have signed the by-laws.

ing contained in any of the votes of the corporation by which the new group were elected which could be construed as a waiver of it. It appears that the by-laws were explained to that group by De Luca at the meeting held prior to their election and that he told them on that occasion of the privileges that they would enjoy if they "sign[ed] up." It also appears that ten members of the new group did in fact sign the by-laws.[1] They are therefore entitled to the rights and privileges of members.

It follows that the final decree in so far as it provides that all the members of the new group are entitled to be recognized as members is erroneous. The decree must be modified so that it will run only in favor of those persons who have signed the by-laws and, as so modified, it is affirmed with costs.

*So ordered.*

---

[1] These were B. F. Kubilius, V. Norbut, J. Grinkaitis, John D. Zachorne, Anthony J. Kupstis, Peter Norbut, Joseph Masteika, Augustinas Dambrauskas, Stanley M. Rainard and Donald W. Miller.