Fahey, Elizabeth M., J.
Plaintiff Central Boston Church (“CBC") brought this action against the defendant, Southern New England Conference Association of Seventh Day Adventists (“SNEC”), seeking an order establishing that SNEC holds a certain 2008 Chevrolet passenger van in constructive trust for the benefit of CBC (Count I), seeking a declaratory judgment that SNEC must transfer title to the van (Count II), and seeking monetary damages for wrongful deprivation of. the van’s use (Count III). SNEC filed a Motion for Summary Judgment. CBC then filed a Cross Motion for Summary Judgment. For the reasons stated below, the defendant’s Motion for Summary Judgment is DENIED. The plaintiffs Cross Motion for Summary Judgment is also DENIED.
BACKGROUND
This case involves a dispute between two religious organizations over the ownership of a 2008 Chevrolet van. The plaintiff, CBC, is a nonprofit organization organized under the laws of the Commonwealth of Massachusetts with a principal place of worship at 131 Cambridge Street, Boston. The defendant, SNEC, is a nonprofit organization, also organized under the laws of the Commonwealth of Massachusetts, with a principal office at 34 Sawyer Street, Lancaster, Massachusetts. SNEC is a subdivision of the larger, global General Conference of Seventh Day Adventists, and it oversees a sisterhood of member churches located throughout Massachusetts, Connecticut, and Rhode Island.
CBC formed in 2002 and began operating as an independent church group. For a time, it held services at the Old West United Methodist Church in Boston. In the following years, however, CBC’s membership grew and it sought to become affiliated with a larger religious organization. In 2006, CBC officers met with representatives from SNEC and another conference of Seventh Day Adventists in order to discuss becoming a part of one of their regional organizations. CBC ultimately chose to affiliate with SNEC. By petition dated June 14, 2006, CBC, as an independent congregation, submitted to become a “church company” within the umbrella of SNEC.
“Church companies,” discussed in greater detail below, are small congregations of worshipers who have expressed a desire to become members of a conference and who are midway through the process of becoming an organized church. “Local organized churches” are distinct and separate entities, and the process by which a church company may apply to become an official organized church is described in detail in the General Conference’s Church Manual. CBC had not yet completed this process by the time this dispute arose.
According to the General Conference’s Church Manual:
Where a number of isolated believers reside in proximity to one another, a company of believers may be organized for fellowship and worship with the objective of growing into an organized church. Such a group of believers may be organized as a company by approval of the conference/mission/field committee and may subsequently be dissolved by action of the conference/mission/field committee . . . Such a company of believers should grow and eventually develop to the point that would call for a regular church organization. The company leadership should therefore promote and foster all the church campaigns and activities that are usually carried forward by regular churches, thus preparing the members for the wider responsibilities that are associated with full church organization.
Gen. Conf. of Seventh-Day Adventists, Church Manual 40-41 (17th ed. 2005). As a church company, CBC was required to open a checking account, which it did under the name “Central Boston Seventh Day Adventist Church,” and was required to submit all tithes and offerings, except for those funds collected for local purposes, to SNEC through the account.
In 2007, one of the plaintiffs parishioners, Milagros Garcia, made a donation of $20,000 to CBC by check in honor of her son who had died in combat in Iraq. *110 Garcia had attended services at CBC fairly regularly before it became affiliated with SNEC. However, she only became a registered member after CBC became a church company. The stated purpose of her donation was to provide funds for CBC to purchase a new passenger van for its parishioners. The board of CBC then voted to purchase a van for CBC’s use with the money from the donation and from additional funds it collected.
The van that is the subject of this action was purchased on January 31, 2008 by representatives of CBC. CBC officers selected a 2008 Chevrolet passenger van with a total purchase price of $29,694.00. The purchase money for the van was paid for entirely by CBC from Garcia’s donation and from its own funds. SNEC did not contribute any amount to the purchase price. Title to the van was placed in SNEC’s name, however.
CBC maintains that this was done for insurance purposes only. It alleges that SNEC’s Secretary and Property Manager, Jeffery Linthwaite, (“Linthwaite”) negligently misrepresented to CBC officers that they would be able to obtain a lower insurance premium if the van was titled in SNEC’s name. Linthwaite also allegedly told CBC that, pursuant to SNEC policy, even though title would be in SNEC’s name, the van would still be CBC’s property.
CBC subsequently learned that they would have to pay thousands of dollars more in premiums each year through SNEC than if they had sought insurance on their own. SNEC allegedly initially quoted CBC $1,500.00 to $1,700.00 per year. CBC was subsequently billed for nearly $11,000.00, more thanathird of the total purchase price of the van. Other disputes between CBC and SNEC arose, principally concerning the pastor that SNEC had assigned to CBC. Due to these difficulties, CBC voted to disaffiliate with SNEC. SNEC then informed CBC that SNEC’s Executive Board would also have to vote on CBC’s disaffiliation. SNEC’s Executive Board held a meeting and voted to allow CBC to disaffiliate. It did not, however, discuss whether CBC should be considered “dissolved,” which has a different technical meaning than disaffiliating. CBC continues to exist as a nonprofit organization and has not ceased holding services. More than 90% of its members have stayed within its organization. A few former members, however, have left CBC to join churches under SNEC’s regional administration.
Shortly after disaffiliation with SNEC, CBC requested that title to the subject van be changed to name CBC as the titleholder. As a result of the request, the SNEC Executive Board held a meeting to discuss ownership of the vehicle. The Board subsequently denied the plaintiffs request for title to the van. The van currently remains in the physical possession of CBC. However, because CBC does not hold title to the van, it is uninsurable and unusable. After failing to resolve the dispute through negotiations, CBC instituted the present action. Ms. Garcia has also sent SNEC a letter expressing her concern and stating that she would not have donated the money for the van if she knew it would become SNEC’s property.
SNEC argues that the court lacks subject matter jurisdiction to hear the plaintiffs claims because the dispute allegedly involves matters of church doctrine. In the alternative, it argues that upon becoming a “church company” within its organization, CBC agreed to be bound by the General Conference’s official Church Manual and that under the relevant provisions in the Church Manual, which are discussed below, title to the van was properly placed in the hands of the conference. CBC claims that it is not bound by the Church Manual because it never became an official local organized church within SNEC. CBC also argues that even if the provisions of the manual do apply to it, CBC, as a church company, was not obligated to hand over title to SNEC. To the contraiy, CBC argues that title should be transferred to it because the relevant Church Manual provisions concerning ownership and use of property donated for local purposes requires that title to the van be in CBC’s name. CBC also contends that, based upon Linthwaite’s alleged misrepresentations, the court should impose a constructive trust, or, in the alternative, a resulting trust. It also seeks monetary damages related to the temporary loss of use of the van.
DISCUSSION
I. Subject Matter Jurisdiction
SNEC maintains that the instant action is a dispute between two religious organizations involving a matter of church policy and authority, and that resolving the dispute would require a determination as to what it means to be a “company” and what it means to be a “church” within the General Conference of Seventh Day Adventists. As such, it argues that, under the First Amendment’s prohibition against civil courts intervening in disputes concerning religious doctrine, discipline, faith or internal organization, this court does not have subject matter jurisdiction to hear the case. Accordingly, it argues that the plaintiffs claims should be dismissed as a matter of law. CBC responds that the dispute concerns a purely secular matter, property ownership, and does not touch upon matters of religious doctrine.
Based on the case law referenced below, this court rejects SNEC’s argument and concludes that it does have subject matter jurisdiction to hear the plaintiffs claims. Allowing the suit to proceed would not require the court to adjudicate matters of religious doctrine, as the court would only be required to determine what precisely the General Conference’s official Church Manual was referring to, according to its own terms and stated definitions, in several relevant provisions. The court can apply neutral principles of law in order to do so. It can also apply neutral principles in determining whether or not CBC was a part of SNEC and *111 by what rules it agreed to be bound. Furthermore, even if CBC was a part of SNEC, the court still does not have to accept as final the decision of SNEC’s Executive Board because the pertinent provisions in the church manual do not “incorporate religious concepts.’’ See Jones v. Wolf, 443 U.S. 595, 604 (1979).
In the seminal case of Serbian E. Orthodox Diocese v. Milivojevich, the Supreme Court held:
[W]here resolution of. . . disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.
426 U.S. 696, 709 (1976). However, “where a dispute directly concerns a purely secular matter (such as rights to church property) and does not implicate matters of church doctrine, discipline, or authority, a court may exert jurisdiction over, and resolve, the dispute by the application of neutral principles of law.” Episcopal Diocese of Massachusetts v. Devine, 59 Mass.App.Ct. 722, 727 (2003), citing Jones, 443 U.S. at 602-03. Indeed, the Supreme Court has emphasized that, “we cannot agree . . . [with the view] that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved.” Jones, 443 U.S. at 605.
SNEC claims that the court lacks subject matter jurisdiction because the action involves matters of religious doctrine that cannot be separated from the dispute. See Serbian E. Orthodox Diocese, 426 U.S. at 710; Episcopal Diocese of Massachusetts, 59 Mass.App.Ct. at 726. The religious or doctrinal matter that SNEC cites, however, is “what it means to be a ‘company’ of the Church.” SNEC claims that this itself is a religious question which should be left to the General Conference to decide.
The issue, however, in terms of the interpretation of the Church Manual as it pertains to this case is not “what it means to be a church company” in a philosophical or existential sense, but rather, whether the Church Manual itself is referring to “church companies” or whether it is referring to “local organized churches” in the provisions regarding title to property. As stated above, the terms have distinct meanings, and the Church Manual imposes a different set of rules and obligations on each type of body. In order to determine what is being referred to, it is not necessary to grasp the notion of “a church company” in some religious sense; it only requires a determination of how the term has been consistently used throughout the document. That can be done by applying neutral principles of law. See Jones v. Wolf, 443 U.S. 595, 604 (1979).
SNEC responds by arguing that every provision in the Church Manual implicitly incorporates religious concepts because there is a catch-all provision which states, “[t]he content of the Church Manual is the expression of the Seventh-Day Adventist Church’s understanding of Christian life and church governance and discipline based on biblical principles. It expresses the authority of a duly assembled General Conference session.” Gen. Conf. of Seventh-Day Adventists, Church Manual 2 (17th ed. 2005). Based on this provision it argues that the court, in interpreting any provision of the Church Manual, would be interpreting doctrinal matters.
This court rejects SNEC’s argument, however, because the Supreme Court has instructed the lower courts to look at church documents, in a more or less line-by-line fashion, to determine whether the provisions in question incorporate religious concepts:
The neutral principles method . . . requires a civil court to examine certain religious documents, such as a church constitution, [in disputes regarding ownership of property] for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If, in such a case, the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.
Id., citing Serbian E. Orthodox Diocese, 426 U.S. at 709 (emphasis added). Implicit in this analysis is the notion that the individual provisions in question should be scrutinized to see whether or not they themselves have any religious import. This court concludes that the provisions at issue in this case do not invoke any such religious concepts. They simply concern how the terms “church company” and “local organized'church” are technically defined, and whether or not both bodies are obligated-to transfer title to all property to the conference.
Allowing the plaintiffs claims to proceed would not require the court to adjudicate matters of religious doctrine. The court can apply neutral principles of law in determining whether CBC was a part of SNEC and, if so, what obligations, if any, that entailed. See id. at 604-06 (holding that the state courts may determine whether a particular group belonged to a larger church organization, so long as the court’s analysis is based *112 on neutral principles). Justice White reiterated this same principle in his concurrence in Serbian E. Orthodox Diocese, when he stated:
Maj or predicates for the Court’s opinion are that the Serbian Orthodox Church is a hierarchical church and the American-Canadian Diocese, involved here, is part of that Church. These basic issues are for the courts’ ultimate decision, and the fact that church authorities may render their opinions on them does not foreclose the courts from coming to their independent judgment. I do not understand the Court’s opinion to suggest otherwise . . .
426 U.S. at 725. In the same vein, SNEC’s Executive Board’s decision regarding title to the van is not un-reviewable because, as explained above, the pertinent questions in the case do not involve doctrinal matters, but principles of document interpretation. See Jones v. Wolf, 443 U.S. at 605, The fact that SNEC’s Board has made a determination regarding the van’s title is irrelevant, because the pertinent provisions in the Church Manual deal with purely secular issues, as discussed below. See id.
II. Summary Judgment Standard
A court should grant summary judgment when a record including pleadings, depositions answers to interrogatories, admissions on the file and affidavit show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); McGuinness v. Cotter, 412 Mass. 617, 620 (1992). The court must construe facts in the light most favorable to the non-moving party. Id. The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986); Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17. The party moving for summary judgment does not bear the burden of proof at trial, may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Tech Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
III. Relevant Sections of the Church Manual
“The bylaws of a church corporation form a contract between the church and its members, and are interpreted according to principles of contract law . . . When the words of a contract are clear, they must be construed in their usual and ordinary sense . . .” General Convention of the New Jerusalem in the U.S.A., Inc. v. Mackenzie, 449 Mass. 832, 835 (2007), citing Mitchell v. Albanian Orthodox Diocese in Am., Inc., 355 Mass. 278, 282 (1969); Kubilius v. Hawes Unitarian Congregational Church, 322 Mass. 638, 644 (1948); Ober v. National Cas. Co., 318 Mass. 27, 30 (1945). Although not referred to as church “bylaws,” the parties both propose that the Church Manual should be treated as a formal contract, and both agree that SNEC, at least, was bound by it. The Church Manual states that it “expresses the authority of a duly assembled General Conference session),]” which is the highest authority in the Seventh-Day Adventist Church. See Gen. Conf. of Seventh-Day Adventists, Church Manual 2 (17th ed. 2005). CBC disputes, however, whether or not it was bound by the Church Manual because it never became an official “local organized church.”
According to the Church Manual, “baptized members of an organized company are members of the conference/mission/field church, [and] the company does not possess the right to administer church discipline. All such matters must be referred to the conference/mission/field committee, which constitutes the board of the conference/mission/field church.” Gen. Conf. of Seventh-Day Adventists, Church Manual 40-41 (17th ed. 2005). The fact that the conference has the authority to administer church discipline amongst the members of subsidiary church companies and the fact that CBC officers themselves submitted a formal petition to become part of the conference supports the inference that they agreed to be bound by the provisions of the Church Manual, as if it were a more conventional contract or set of bylaws. Accordingly, the court will review the provisions in the Church Manual relevant to title to properly and will interpret the terms in their usual and ordinary sense.
SNEC argues that according to the clear and unambiguous language of the Church Manual, title to the van was properly placed in its name. The subsection of the Church Manual entitled “Title to Church Properties” states, in pertinent part:
In order to safeguard denominational property it is necessary to have the title vested in a corporation created by a conference organization according to the laws governing in the locality where the property is located. Title to all local church properties should be held by the conference corporations.
Gen. Conf. of Seventh-Day Adventists, Church Manual 225 (17th ed. 2005) (emphasis added). SNEC also refers to a section of the Church Manual which states:
On dissolution or expulsion of a church for loss of members or for disciplinary reasons, all offerings, financial accounts and all property, real or personal, whether held in the name of a local church or the conference or other denominational legal association, are held in trust for the conference mission field. The conference mission field therefore has the right, the authority and the duty to administer, protect or dispose of said property and funds. All books and records of such a church are to be held *113 in the custody of the conference secretary and/or treasurer.
Gen. Conf. of Seventh-Day Adventists, Church Manual 214 (17th ed. 2005) (emphasis added). Based on these provisions, SNEC argues that CBC was obligated to transfer title of the van to SNEC when it purchased the vehicle, and that, if it had failed to do so, upon disaffiliation, title should have gone to the conference anyway.
As stated above, however, the terms “local organized church” and “church company” have distinct meanings and are not used interchangeably in the Church Manual. There is a specific process, expressly stated, through which a church company can become elevated to the level of a local organized church:
Churches are organized by an ordained minister on the recommendation of a conference/mission/field committee. Since so much is involved in the organization of a church, the local conference/mission/field president should, whenever possible, be invited to be present. When a company ... is prepared to assume the responsibilities of an organized church, the conference/mission/field president should be taken into counsel and a date should be agreed upon for the organization to take place.
Gen. Conf. of Seventh-Day Adventists, Church Manual 209 (17th ed. 2005) (emphasis added). SNEC does not dispute the fact that these and other steps outlined in the Church Manual were never taken. The conference committee never recommended that CBC be organized into a local church, nor was a date ever set for organization to take place. The parties also agree that CBC was indeed a “church company” at the time the events in question took place. As such, the provisions that SNEC cites, regarding the specific obligations of local organized churches, are largely irrelevant.
In addition, CBC notes that it was never dissolved or expelled, but had simply become disaffiliated with SNEC. The courts have noted this legal distinction in the past and have held that where a church bylaw unambiguously used the term “dissolution” instead of “disaffiliation,” the bylaw would not apply where a church had only disaffiliated from the larger organization and had not been dissolved. See The General Convention of the New Jerusalem in the U.S.A., Inc. v. MacKenzie, 449 Mass. at 835 (“We do not locate an ambiguity in the language of the dissolution bylaw, and hold that it is triggered only upon dissolution, and not by disaffiliation”). Therefore, even if CBC were a local organized church, the second section that SNEC cites in support of its argument would still not apply.
CBC also notes that the portion of the Church Manual that specifically defines church companies and the duties of company officers states:
The treasurer of the company shall keep careful record of all money received and disbursed. He/She shall send promptly, at the time established by the conference/mission/field, all tithes and offerings, other than funds collected for local purposes, to the conference/mission/field treasurer, who is also the treasurer of the conference/mission/field church.
Gen. Conf. of Seventh-Day Adventists, Church Manual 40 (17th ed. 2005) (emphasis added). Based on this provision, CBC argues that Garcia’s offering was intended to be used for, and was in fact used for, a “local purpose,” and therefore it was not obligated to transfer title to the property that it had bought with the offering to SNEC. This court agrees. SNEC has not pointed to any provisions in the Church Manual which would obligate CBC, as a church company, to transfer title to SNEC, and, indeed, it seems that under the relevant provisions, the van, which was essentially donated for a “local purpose,” was not required to be titled in SNEC’s name.[1] CBC did, however, voluntarily transfer title to SNEC, and therefore it is necessary for the court to consider whether a constructive or resulting trust should be imposed for the benefit of CBC, and whether CBC should be compensated for the loss of use of the vehicle.
IV. Constructive Trust
“The court may impose a constructive trust where one acquires an interest in property in breach of a legal duty to one who has granted that interest.” Id. at 247, citing Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 789 (1994), cert. denied, 511 U.S. 1142 (1994). “A constructive trust is imposed ‘in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained (a) by fraud or (b) in violation of a fiduciary relation or (c) where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information.’ ” Kelly v. Kelly, 358 Mass. 154, 156 (1970), quoting Barry v. Covich, 332 Mass. 338, 342 (1955).
CBC argues that the court should impose a constructive trust for CBC’s benefit to avoid SNEC’s becoming unjustly enriched due to either the existence of a special relationship and breach of special trust, a breach of fiduciary duty, SNEC’s negligent misrepresentations, or actual fraud. Each of the underlying theories is factually predicated on the alleged statements that Linthwaite made to CBC’s officers just prior to their agreeing to place title to the van in SNEC’s name. CBC argues that Linthwaite, as the Secretary and Property Manager of the regional conference, owed CBC a duty to provide it with accurate information regarding SNEC’s policies and the full implications of placing title to the van in SNEC’s name. CBC also argues that Linthwaite’s intentional or negligent misrepresentations about the benefits of placing title in SNEC’s name and insuring the van through SNEC caused a loss to CBC which was based on their justifiable reliance on his information.
*114 SNEC disputes the content of the statements that Linthwaite made to CBC’s officers and disputes when the conversations took place. It also denies that Linthwaite promised that title to the van would be transferred back to CBC upon its disaffiliation from SNEC. It further alleges that CBC officers understood that the van would be available for CBC’s use, but that title would remain in SNEC’s name. For the purposes of the constructive trust analysis, SNEC argues that the court cannot conclude that a special or fiduciary relationship existed between CBC parishioners and Linthwaite- because such a conclusion would require the court to “affirm questions of purely spiritual and doctrinal obligation.” See Maffei v. Roman Catholic Archdiocese of Boston, 449 Mass. 235, 249-50 (2007). Finally, it argues that statements promissory in nature cannot support a claim of negligent misrepresentation and that there is no evidence in the record of intentional misrepresentation, and as such, there is no basis to support the imposition of a constructive trust. See id. at 252.
A. Special/Fiduciary Relationship
CBC argues that Linthwaite, as SNEC’s Secretary and Property Manager, was trusted with dispensing information to those persons within SNEC’s sisterhood of churches who required his assistance in the insuring or titling of property, and that he breached his duty by misrepresenting the price of yearly insurance premiums for the van. CBC also claims that Linthwaite misrepresented SNEC’s policies when he told them that, although title to the van would be in SNEC’s name, the van would still be CBC’s. In response, SNEC argues that, based on the Supreme Judicial Court’s decision in Maffei, CBC cannot establish that either a fiduciary relationship or a special relationship of trust and confidence existed between Linthwaite and CBC’s parishioners. See 449 Mass. at 249-50.
In Maffei, the Supreme Judicial Court stated:
A ruling that a Roman Catholic priest, or a member of the clergy of any (or indeed every) religion, owes a fiduciary-confidential relationship to a parishioner that inheres in their shared faith and nothing more is impossible as a matter of law. Such a conclusion would require a civil court to affirm questions of purely spiritual and doctrinal obligation ... all of these inquiries bearing on resolution of the [the plaintiffs’] fiduciary claims would take us far afield of “neutral principles of law.” See Jones v. Wolf, 443 U.S. 595, 602 (1979). We decline to hold that, as a matter of civil law, the relationship of a member of the clergy to his or her congregants, without more, creates a fiduciary or confidential relationship grounded in their shared religious affiliation for which redress is available in our courts.
449 Mass. at 249-50, footnotes omitted. SNEC argues that Linthwaite, as Secretary of SNEC, was in a position similar to that of the priest in Maffei, and that a determination that he owed a duty to CBC parishioners would require the court to adjudicate a matter of religious doctrine.
SNEC’s argument has merit. According to the Church Manual, the Conference Secretary performs the duties that are normally carried out by local church clerks and church treasurers. It also states that such officers are “called to an important task” and that church treasurers, in particular, are in a position of “sacred responsibility.” Gen. Conf. of Seventh-Day Adventists, Church Manual 40, 45, 60 (17th ed. 2005). It is not for the court to determine what such “sacred responsibilities" Linthwaite’s position entailed, and the use of the phrase “called to” in the Church Manual may well also have religious significance. For these reasons, the court cannot, as a matter of law, rule that Linthwaite, when acting in his official capacity as Conference Secretary, was in a fiduciary relationship or a relationship of special trust and confidence with CBC parishioners. See Maffei, 449 Mass. at 249-50. CBC’s claim for constructive trust, therefore, cannot be predicated on the theory that such a relationship existed.
B. Negligent or Intentional Misrepresentation
The plaintiffs also allege, however, that a constructive trust should be imposed based upon the defendant’s misrepresentation that CBC would pay lower premiums if it insured the van through SNEC, and that, as a matter of SNEC policy, title was being placed in SNEC name for insurance purposes only. The First Amended Complaint states, in pertinent part:
SNEC . . . offered to insure the van at a lower cost under a policy covering multiple vehicles. CBC agreed to SNEC’s proposal. . . SNEC’s representative informed CBC’s representative that, per SNEC’s policy, title had to be in SNEC’s name to insure the vehicle. SNEC’s representative stated that, although SNEC would hold formal title to the van, the van would belong to CBC and SNEC would not refuse to hand title over to CBC as the rightful owner.
(Pl.’s First Am. Compl., pars. 13, 17.) SNEC disputes the content of Linthwaithe’s statements, but also argues that, even if such a statement was made, it should be considered a statement promissory in nature and therefore un-actionable under the theory of negligent misrepresentation. It also states that no evidence of intentional misrepresentation has been produced.
In order to recover on the theory of negligent misrepresentation, “a plaintiff must prove that the defendant, in the course of his business, made a false representation of material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage.” Kitner v. CTW Transprt, Inc., 53 Mass.App.Ct. 741, 749 (2002), citing Nycal Corp. v. *115 KPMP Peat Marwick LLP, 426 Mass. 491, 496 (1998); Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77 (1991). The defendant need not have known of the statement’s falsity, he need only have “failed to exercise reasonable care or competence in obtaining or communicating the information.” Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999), quoting Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 587-88 (1996).
However, “(i]t is a general rule that the law refuses to permit recovery in tort [under the theory of negligent misrepresentation] for damages resulting from reliance upon false statements of belief, of conditions to exist in the future, or of matters promissory in nature.” Harris v. Delco Products, 305 Mass. 362, 365 (1940), citing Loughery v. Central Trust Co., 258 Mass. 172, 175 (1927). “A statement promissory in nature ‘is not properly a representation, but a contract . . .’ ” and therefore does not sound in tort, unless deceit is alleged. Ernest F. Carlson Co. v. Fred T. Ley & Co., 269 Mass. 272, 277 (1929), quoting Daw v. Morris, 149 Mass. 188, 191 (1889). “A‘subsequent refusal to carry out an oral promise, standing by itself, is not... fraud’ remediable by a constructive trust.” Maffei, 449 Mass. at 252.
Such a claim may be brought, however, under the theory of intentional misrepresentation, where actual fraud is alleged. To maintain such a claim, “the plaintiff must prove ‘that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.’ ” Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982), quoting Barrett Associates v. Aronson, 346 Mass. 150, 152 (1963). Statements of present intention may serve as the basis for such actions if “the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704 (1990). The plaintiff must prove that the defendant did not intend to fulfill the promise at the time the promise was made. See Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc., 68 Mass.App.Ct. 582, 601 n.45 (2007).
There is no evidence in the record tending to show that Linthwaithe’s alleged misrepresentation was intentional, i.e., that when he made the statement that he knew or intended that SNEC would refuse to turn over the title. Therefore, CBC cannot base its constructive trust claim upon the theory of intentional misrepresentation. See Maffei, 449 Mass. at 252. However, in this court’s opinion, the statements that CBC alleges Linthwaite made can be considered representations about the organizational policy that SNEC was already bound by; that, according to SNEC policies, “although SNEC would hold formal title to the van, the van would belong to CBC and SNEC would not refuse to hand title over to CBC as the rightful owner.” (Pl.’s First Am. Compl., par. 17.)
In Maffei supra, the Supreme Judicial Court distinguished between an alleged oral promise and a statement verifiable when made. In that case, it found that the particular statement in question, about the future use of church property, took the form of a promise, that it was not simply a statement about the church organization, and that therefore it could not serve as the basis for the imposition of a constructive trust. 449 Mass. at 252 (“[An] alleged oral promise of a church existing in perpetuity and in James’s honor cannot fairly be characterized as a verifiable statement when made, and is thus materially different from, for example, a statement about corporate structure and signing authority ... or a statement about the financial condition of one’s subsidiaiy . . .”), citing Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 730-31 (1974); Gopen v. American Supply Co., 10 Mass.App.Ct. 342, 345 (1980).
In this court’s opinion, however, Maffei is distinguishable, as Linthwaite’s alleged statements can reasonably be construed as statements of fact about SNEC’s then existing policies, which ought to be considered a statement verifiable when made, rather than a promise. The Amended Complaint states, “SNEC’s representative informed CBC’s representative that, per SNEC’s policy . . . although SNEC would hold formal title to the van, the van would belong to CBC and SNEC would not refuse to hand title over to CBC as the rightful owner.” (Pl.’s First Am. Compl., par. 17.) This may therefore be characterized as a negligent misrepresentation so long as Linthwaite failed to exercise reasonable care or competence in obtaining or communicating the information, which is a question of fact for the fact-finder. As a result, CBC’s claim for constructive trust survives under the theory of negligent misrepresentation, and summary judgment is inappropriate.
V. Resulting Trust
CBC, in its Memorandum in Opposition to Defendant’s Motion for Summary Judgment and Plaintiffs Cross Motion for Summary Judgment, argued for the first time that a resulting trust should be imposed for CBC benefit. SNEC argues, however, that since a claim for resulting trust was not alleged in the original or amended complaint, CBC should be es-topped from bringing such a claim. In this court’s opinion, CBC alleged sufficient facts in its complaint to form the basis of a claim for the imposition of a resulting trust, and, when construed liberally, serves as a claim for resulting trust.
“Unlike a constructive trust, a resulting trust pivots on the key element of intention.” Maffei, 449 Mass. at 254. “A resulting trust . . . arises where one parly furnishes the consideration to purchase property, not intending a gift or advancement, yet title is taken in the name of another.” Fortin, 416 Mass. at 789, citing *116 Meskell v. Meskell, 355 Mass. 148, 150 (1969). “A resulting trust must arise, if at all, at the time of the execution of the deed.” Id.., quoting Dwyer v. Dwyer, 275 Mass. 490, 494 (1931) (real estate context).
CBC alleges that it furnished the consideration for the van and that title was placed in SNEC’s name, not as a gift, but for insurance purposes only. This is sufficient to form the basis of a claim for resulting trust, which is construed from CBC’s factual allegations. CBC’s officers’ intent at the time the van was purchased and title was placed in SNEC’s name is a question of fact and summary judgment is therefore inappropriate at this time.
ORDER
For the above-mentioned reasons, it is hereby ORDERED that Defendants’ Motion for Summary Judgment be DENIED and Plaintiffs Cross Motion for Summary Judgment be and hereby is DENIED.

 In addition, there is a similar provision in the section describing title to church property which slates, “When properties are acquired for use of local churches or conference organizations, the titles should be held by the corporate organizations." Gen. Conf. of Seventh-Day Adventists, Church Manual 225 (17th ed. 2005). This suggests that even if CBC was a local organized church instead of a church company, title to the van, which was donated for local use, should have stayed in the local church’s corporate name.